## BOARD OF EDUCATION OF CARTERSVILLE *et al.* v. PURSE, next friend, *et al.*

A board of education having the charge and control of a system of free schools established by law and supported by taxation has the right to suspend from attendance upon school children whose parent, whether father or mother, in undertaking to call in question or interfere with the discipline of a teacher over one of these children, enters the schoolroom of such teacher during school hours and in the presence of the scholars there assembled uses offensive or insulting language to such teacher. This is true though none of the children so suspended had in fact been guilty of any violation of the rules of school.

ATKINSON and LITTLE, JJ., dissenting.

Argued February 11, Reargued April 13,—Decided August 5, 1897.

Mandamus. Before Judge Fite. Bartow county. January 13, 1897.

Mr. and Mrs. John ˙M. Purse, citizens of Cartersville, had three daughters attending one of the public schools of that city. In October, 1896, Mrs. Purse went to the school during its regu-

lar exercises and had some conversation with the teacher, the nature and purport of which seems to be in dispute, but as a consequence of which the teacher made a report to the superintendent of schools, who thereupon sent the following communication to Mr. Purse:

"Dear Sir,—In consequence of your wife's having entered Miss Hall's room to-day during school hours, and having seriously interfered with the discipline of the school, I am in duty bound to suspend all your children. If this wrong is repaired as far as possible, the suspension will be only temporary; otherwise it will be in force until the end of the present school year."

Mrs. Purse appealed to the grievance committee of the board of education, charging the superintendent with suspending her children without cause and without authority; denying that she had seriously interfered with the discipline of the school or said anything unbecoming a lady, and asserting that the intention of her visit was for good, etc. The committee required that the matter be presented in writing, declining to have any oral hearing. Upon consideration of the charges presented, a letter from Mrs. Purse, and a statement from the superintendent and from the teacher, the committee reported to the board, that the conduct of Mrs. Purse in entering the school-room and unkindly criticising the teacher's conduct and methods in the presence of her pupils was prejudicial to proper discipline; that it was the duty of the teacher to report the matter to the superintendent; and that the suspension was proper. Further, that Mrs. Purse visited the school the next day after the suspension, just as school was dismissed, and charged the teacher to her face that she was no lady, in consequence of having reported Mrs. Purse's conduct to the superintendent. The committee recommended that, if Mrs. Purse would make to the teacher such apology as would satisfy her on her own behalf and on behalf of her pupils, the suspension would end with November, 1896; otherwise, that it would continue as per the order of the superintendent. This report was adopted by the board; whereupon Mrs. Purse, as next friend of her three children, brought her petition against the board

of education and the superintendent of schools, praying for mandamus requiring them to receive the children in their former places in the public school; and that they be enjoined from further enforcing the order of suspension, and from doing any act of interference with the attendance of the children and their full enjoyment of the benefits of the school; and for general relief. The grounds of the petition are, in brief, that the children were suspended or expelled without cause, and not on account of any misconduct or violation of rules on their part, but solely on account of the charge made against Mrs. Purse individually; that the finding of the board of education was neither fair nor impartial, for sundry reasons stated; that the suspension is an injury which can not be estimated in money and is irreparable; and that under the rules and regulations of the board, the power of suspension is not vested in the superintendent, and his act in the premises is null and void. By amendment, the name of J. M. Purse was added as a party plaintiff. To this amendment defendants demurred, on the ground that it adds a new and distinct party. The demurrer was overruled. Defendants further demurred to the petition, on the following grounds:

1. No cause of action is set forth.

2. Defendants are improperly joined, it appearing that the superintendent of schools is merely the servant and agent of the board against whom the real complaint is lodged.

3. The right of action vests alone in the husband of Mrs. Purse.

4. No right to attend the public schools appears in the children, but the right is in J. M. Purse for him and his wife only. He is not a party, nor is she, in her personal capacity.

5. It does not appear that the board of education abused the discretion vested in them by law.

6. Plaintiffs had an adequate and complete remedy by certiorari, and mandamus is not allowable for the correction of an alleged error in the judgment of the board excluding the children from the schools.

This demurrer also was overruled; and defendants answered, taking issue with all the material allegations of the

petition, denying that the presence of these children at the school would not affect the school injuriously; but asserting on the contrary, that its discipline had already been seriously affected and injured by the temporary restraining order granted by the court, and if the same should be continued, the order and discipline of the public-school system would be seriously and irreparably impaired; that the pupils, seeing that their parents might at pleasure interfere with and insult the teachers, invade the schoolroom and in the presence of the pupils accuse the teachers of partiality and favoritism, would no longer respect the teachers' authority or that of the board, and inexpressible harm would result, and the blow would be disastrous if not fatal to the schools; that the right to the benefit of the schools lies, not in the children, but in the parents, such right being to have the child educated free of tuition, provided the parent so conducts himself or herself as not to interfere with the order and conduct of the schools or impair their efficiency, and such right is forfeited by any parent who thus interferes; and that the practice, custom and rule of the board, suspending pupils for their parents interfering with the discipline or order of the school, is reasonable and just, and is the only means of preventing such interference as would result in unmeasurable evil to the pupils themselves. It was admitted that Mrs. Purse's misconduct was the cause of the suspension of her children; but submitted that, though not entitled to have them restored at all, she was allowed to have them put back if she would make proper apology to the teacher to whom she had used insulting language, which she declined and still declines to do; and that thus it is by her own fault that she deprives her children of the benefit of the schools.

Upon motion, the court granted a mandamus absolute, requiring that the children be received to their former places in the school, under the rules for the government thereof. To this ruling, and to the others before noted, defendants excepted.

*J. W. Akin, J. M. Neel* and *A. M. Foute,* for plaintiffs in error. *J. W. Harris, Jr.,* and *A. S. Johnson,* contra.

Cobb, J. The official report states the facts.

When a parent goes to the schoolroom of a lawfully established public school and in the presence of his or her children and other pupils publicly calls in question the justice or correctness of a decision made by the teacher in a matter of discipline relating to such children, uses offensive and insulting language to such teacher, and acts in such a manner as to interrupt the exercises of the school, and conducts himself or herself in such a manner as to bring the teacher and the discipline of the school into contempt in the eyes of the pupils, it is not only lawful, but it is the duty of the authorities of the school in the protection of the teacher whom they have placed on duty, as well as to sustain the character and discipline of the school, to exclude from the schoolroom the children of such parent, and this too although those thus excluded had not been guilty of a violation of any rule of the school.

The constitution of the State provides that "There shall be a thorough system of common schools for the education of children in the elementary branches of an English education only, as nearly uniform as practicable, the expenses of which shall be provided for by taxation or otherwise. The schools shall be free to all children of the State, but separate schools shall be provided for the white and colored races." Civil Code, § 5906.

The General Assembly, in the act intended to carry out this mandate of the constitution and provide a system of common schools outside of incorporated towns and cities, declared that "Admission to all common schools shall be gratuitous to all children between the ages of six and eighteen years, residing in the subdistricts in which the schools are located." Political Code, § 1378.

It is also provided in the constitution that "authority may be granted . . to municipal corporations, upon the recommendation of the corporate authority, to establish and maintain public schools within their respective limits, by local taxation; but no such local law shall take effect until the same shall have been submitted to a vote of the qualified voters in each . . municipal corporation and approved by

à two-thirds vote of persons qualified to vote at such election; and the General Assembly may prescribe who shall vote on such question." Civil Code, § 5909.

By an act approved December 24, 1888, the General Assembly, under the authority of the section last quoted, made provision for the establishment of a system of public schools in the city of Cartersville, to be maintained by local taxation. (Acts 1888, p. 323.) The election which the constitution required having resulted in favor of the establishment of the schools, the act went into effect and the schools thus established went into operation. The government of the schools was vested in a board of commissioners, who had "authority to establish, and from time to time modify, a system of public schools for said city of Cartersville, to be open not less than six nor longer than ten scholastic months in each year," and also "to purchase, build, enlarge, and rent buildings, appurtenances and furniture for school purposes, to employ a superintendent or principal and other teachers, to suspend or discharge them for good causes, to prescribe the terms upon which students are to be received into said schools, and to establish such rules, regulations and by-laws as they may deem right and proper in maintaining a system of public schools in said city: *provided*, the same are not inconsistent with the constitution and laws of this State." It was declared that "all children between the ages of six and eighteen years, whose parents, guardians, or natural protectors bona fide reside within the corporate limits of said city, shall be entitled to the benefit of said schools."

That municipal schools thus established are a part of the common-school system provided for by the constitution there can be no question; and they must therefore conform in all respects to the requirements of the constitution. It follows that the act creating the school system for the city of Cartersville must be construed as establishing schools which shall be free to all children who may lawfully enter the same in that municipality. *Irvin* v. *Gregory*, 86 *Ga.* 605.

The board of commissioners of the city of Cartersville (hereafter referred to as the board of education) adopted the follow-

ing rule in reference to the admission of children into such schools: "All children residing within the limits of the city, who are not otherwise disqualified by these regulations, and who are between the ages of six and eighteen years, shall be entitled to attend the public schools of the city, the parents or guardians furnishing to the principals evidence of their citizenship, giving name and age of pupil and name of street on which they reside."

Under such a system as that above outlined, beginning with the constitutional provision for a system of common schools and ending with the rule of the local school board, is the right to attend school inherent in the child; or is the purpose of the law simply to provide a place where parents may discharge the obligation which they owe to their children to give them an education?

At common law it was the duty of parents to give to their children "an education suitable to their station in life—a duty pointed out by reason, and of far the greatest importance of any." 1 Black. Com. 450.

"The education of children in a manner suitable to their station and calling is another branch of parental duty, of imperfect obligation generally in the eye of the municipal law, but of very great importance to the welfare of the State. Without some preparation made in youth for the sequel of life, children of all conditions would probably become idle and vicious when they grow up, either from the want of good instruction and habits, and the means of subsistence, or from want of rational and useful occupation. A parent who sends his son into the world uneducated, and without skill in any art or science, does a great injury to mankind, as well as to his own family; for he defrauds the community of a useful citizen, and bequeaths to it a nuisance. This parental duty is strongly and persuasively inculcated by the writers on natural law." 2 Kent's Com. *195–6.

In the case of Rulison *v.* Post, 79 Ill. 567, Mr. Justice Walker in the opinion says: "Parents and guardians are under the responsibility of preparing children entrusted to their care and nurture for the discharge of their duties in after life. Law-

givers in all free countries, and, with few exceptions, in despotic governments, have deemed it wise to leave the education and nurture of the children of the State to the direction of the parent or guardian. This is, and has ever been, the spirit of our free institutions. The State has provided the means, and brought them within the reach of all, to acquire the benefits of a common-school education, but leaves it to parents and guardians to determine the extent to which they will render it available to the children under their charge."

While the common law recognized this as a duty of great importance, there was no remedy provided for the child in case this duty was not discharged by the parent. The child at the will of the parent could be allowed to grow up in ignorance and become a more than useless member of society; and for this great wrong brought about by the neglect of his parents the common law provided no remedy. Not only no remedy was given to the child, but no punishment was inflicted upon the parent. It attempting to give a reason for this defect in the common law, Sir William Blackstone says: "Perhaps they thought it punishment enough to leave the parent, who neglects the instruction of his family, to labour under those griefs and inconveniences, which his family, so uninstructed, will be sure to bring upon him." 1 Black. Com. 781.

While the common law provided for apprenticing poor children and thereby giving them some of the advantages of an education, "the rich indeed," says the same writer, "are left at their own option, whether they will breed up their children to be ornaments, or disgraces, to their family." This part of the common law became a part of the law of this State. Civil Code, § 2501. The section cited declares that the father shall provide for the maintenance, protection, and education of his child, but relatively to the matter of education no provision is made for the punishment of a parent who fails to discharge this duty, or for the relief of the child who is a victim of such failure. It will be seen from an examination of our statutes in reference to the subject of education at the public expense, that they contain nothing which expressly or impliedly alters

the common-law rule, that education is a duty owed by the parent to the child.

The constitution of 1777 provided: "Schools shall be erected in each county and supported at the general expense of the State, as the legislature shall hereafter point out and direct." Marbury & Crawford's Dig., p. 12. The constitution of 1798 provided: "The arts and sciences shall be promoted in one or more seminaries of learning, and the legislature shall, as soon as conveniently may be, give such further donations and privileges to those already established as may be necessary to secure the objects of their institution; and it shall be the duty of the General Assembly at their next session to provide effectual measures for the improvement and permanent security of the funds and endowments of such institutions."

The Code of 1861 provided for an educational fund and officers in whose hands its management should be placed, and the plan of its distribution among the several counties. Code 1861, §§ 1189–1218. The beneficiaries of this fund were children between the ages of six and eighteen years within the several counties, but "children of parents who are unable to educate them, children discarded by their parents, and indigent orphan children" were to be first provided for. Code 1861, § 1219.

A study of the history of the school law in this State, from 1785 when the legislature provided for a complete system of State education with a central seat of learning, down to the adoption of the Code of 1861, will disclose occasional efforts to provide a system of free schools which would educate the entire population of the State without regard to the ability of the parent to furnish the child with education at his own expense. Prince's Dig. 866, 869. While the act of 1785 was primarily for the purpose of establishing "a public seat of learning," and did result in the establishment of the University of the State, the plan of the framers of the act was much broader than this, and it was distinctly provided that "all public schools instituted or to be supported by funds or public moneys, in this State, shall be considered as parts or members of the University, and shall be under the foregoing directions and regulations."

An effort was made at a later day to provide a system of county academies and free schools, to carry out the intention of the framers of the act of 1785.   Prince's Dig. 17.   In 1819 and 1821 appropriations were made amounting to $675,000, the principal of which was required to be invested in bank stock, and the interest to be used for the support of academies and free schools throughout the State.   Hotchkiss's Stat. Law of Ga., 178 and note.

By the act of 1837 (Acts 1837, p. 94) the academic and poor school funds were consolidated, and set apart for the support of a "general system of education by common schools." It is interesting to notice in this connection that one of the purposes for which this fund was to be expended was to purchase books and stationery for children whose parents were unable to furnish the same.   This act with its amendments remained in force until 1840, when it was repealed.   (Acts 1840, p. 61.)   The common-school system was abandoned, and the fund set apart for that purpose became a poor-school fund.   These efforts, made from time to time to establish a system of free schools for all of the children of the State, were not successful, the result in each instance being either a repeal of the appropriation, or a return to the poor-school system.

The constitution of 1865 provided that, "The General Assembly shall have power to appropriate money for the promotion of learning and science, and to provide for the education of the people, and shall provide for the early resumption of the regular exercises of the University of Georgia, by the adequate endowment of the same."   Code 1868, §4937.

The constitution of 1868 provided that "the General Assembly, at its first session after the adoption of this Constitution, shall provide a thorough system of general education to be forever free to all children of the State, the expense of which shall be provided for by taxation, or otherwise."   Code 1873, §5132.

The various acts of the General Assembly passed from time to time to carry into effect these constitutional provisions, upon examination, will be seen to be entirely consistent with the scope of the constitution, which seems to provide a system of

public education which should be free to all the children of the State.

The common-law rule being clear and unequivocal, that, while the duty rested upon the parent to educate his child, the law would not attempt to force him to discharge this duty, the child, so far as education is concerned, is completely at the mercy of the parent. Therefore at common law the child had no right to demand an education at the hands of the parent. This being the common-law rule, no law of this State, either constitutional or statutory, will be held to alter or abolish it, unless the terms of such law imperatively demand such construction. Every constitution that has been of force in this State, and every statute passed thereunder, from the first constitution adopted in 1777 to the one now of force, adopted one hundred years later, will be found to be in all of their varying provisions on the subject of education entirely consistent with the common-law rule which declares that it is the duty of the parent to educate his child, but at the same time leaves the child remediless if the duty is not discharged. The laws now of force only provide means for the parent to discharge the natural and moral duty which is upon him, and do not confer upon the child any right which he did not have at common law. At common law the child's right to an education was dependent, not only upon the will, but upon the pecuniary ability of the parent. Under the present law in this State the right of the child to an education is still dependent upon the will of the parent, but no longer dependent upon his pecuniary ability. It would be contrary to the policy of our law, based as it is upon the common law, to bestow upon the child in the matter of its education any right independent of the parent. It needs no argument to sustain the proposition that the father is, and ought to be, the head of the family; and the public has the right to look to him to control his children. A law which would take from him this control and deprive the public of the benefits to be derived from such control would be in conflict with our established institutions. A child in Georgia has the same right to an education at the hands of his parent that he had at common law, but no more. He could

not at common law require his parent to educate him; he can not in Georgia compel his parent to provide an education for him. At common law, if his parent was willing but had not the means to carry out this will, the child must go without an education; in Georgia, if the parent is willing, the State provides a fund which is available to him, whether he be pecuniarily able to discharge the expense incident to an education, or not. If the parent in Georgia, notwithstanding the fund provided for the purpose of educating his children, is not willing to discharge the duty, even at the expense of the State, there is no power under the law to compel him to discharge it, and the doors of the courts are closed against the child, whether he comes in his own name, or comes in the name of another as his next friend. The parent in Georgia owes the duty to his child to educate him, and the State has furnished the means for the payment of the expense incident to the discharging of such duty; but the child is as completely at the mercy of the parent as he was at common law.

The law providing for a public-school system was not intended to create any new right in, or give any new remedy to, a child. It being settled that the presence of the child in school depends absolutely upon the consent and will of the parent, the school authorities are justifiable in dealing with the child in the light of this fact. As it is the purpose of the State to aid the parent in discharging a duty by furnishing a fund to pay the expense incident to discharging such duty, it is the right of the State, through its constituted authorities, to require of the parent that he shall do nothing inconsistent with the peace, good order, and authority of the system which is provided for his benefit. While it is hard upon the child to be deprived of the benefit of an education because his parent will not submit himself to the reasonable rules, regulations, practices, and customs incident to the system providing for the education of his child, it is no harder than the rule at common law, which left the child completely at the mercy of the parent's will, so far as obtaining an education was concerned; in fact, the status of the child is the same. At common law he was at the mercy of an arbitrary parent

whether he should be placed at school or not; placed at school in Georgia, he is still at the mercy of an arbitrary parent who may so conduct himself as to deprive the child of the benefits to be derived from an education. There is no law which requires a parent to send his children to the public schools. A child who is entered at a public school must be required to conduct himself so as not to interfere with the discipline of the school. If this duty is incumbent upon the child, it would seem that for a stronger reason a similar duty would rest upon the parent who is the real beneficiary of the system. Public education which fails to instill in the youthful mind and heart obedience to authority, both private and public, would be more of a curse than a blessing; and the parent who in the schoolroom, or in the vicinity of the school, in the presence of the children, so acts as to create the impression that the true way of life is lawlessness and utter disregard of the rights of other people, should not only receive the punishment which the penal laws of the State would inflict upon him (Penal Code, § 427), but should also be deprived of the benefit of the fund which is provided to pay an expense which natural and moral duty would otherwise require him to bear. We must not be misunderstood. We do not intend that the argument should go to the length that the school authorities would have the right to exclude the child from the benefits of the school because of improper conduct on the part of the parent, as to matters which are entirely disconnected with the school, or the attendance of the child, or the conduct or behavior of the parent with reference thereto. This right, as we have seen, would only arise where the parent interferes in a matter involving the discipline or conduct of such child.

That the parent is guilty of acts which are unlawful and immoral, would not necessarily have the effect of forfeiting his right to participate in the public-school fund and justify the authorities in excluding the child. The right of the child to attend a public school is dependent upon the good conduct of the parent, as well as of the child. Both must submit to the reasonable rules and regulations of the school, and the parent must so conduct himself as not to destroy the influence

and authority of the school management over the children whenever he comes in contact with the school authorities, whether commissioners, officers, or teachers, under circumstances where his conduct would be likely to influence the conduct of his children. The schoolmaster has always stood in loco parentis for certain purposes, and notwithstanding the change from private schools into public schools, the schoolmaster of the present system is, and ought to be, in the place of the parent in a great many particulars. It is therefore a duty which the parent owes, not only to the master, but to the pupil himself—his child—that he who stands in the parent's shoes should not be impeded in discharging a duty which the parent has voluntarily placed upon him. Therefore, it necessarily follows that when the parent has taken advantage of the school fund to discharge the burden which he would otherwise have to carry himself, and has placed his child under the control of the schoolmaster thus provided, any misconduct on his part which would interfere with the master in discharging the duty which he owes to such child would result, under the present system, as it always did under the old system, in the exclusion of the child from the benefits to be derived through the services of the master.

There was read in the argument of this case a letter written by Ex-Chief Justice Bleckley to counsel for plaintiff in error, which contained an expression of his opinion upon the subject now under consideration. The words used by him so aptly express our views that we embody them herein as a part of our opinion: "Without having studied the question thoroughly, I have a strong impression that you are right in the fundamental merits of the case. If we had a compulsory school system, the right of the child would probably not be affected by the conduct of the parent; but our system looks to voluntary co-operation by the parent in carrying out the system, and where that is withheld in a matter vital to some discipline, the child has no more right to remain in the school than it would have if the parent objected to its remaining. Neither the school authorities nor any court could compel the child for its own interest to enter the school or remain

in it without the parent's consent; and where that consent is not given on the terms rightly prescribed by the school board, it is the same as withheld, or not given at all.   It is certain that parental discretion can be exercised in keeping the child out of school.   Can it also be exercised in keeping it in, irrespective of considerations of sound discipline, though the invasion of discipline may be by the parent and not by the child? If so, the whole field of discretion is covered by the parent's will, and a very limited part of it by public authority.   Where a scheme of work contemplates joint effort, if one of the parties refuses to co-operate on reasonable terms, the other may decline to continue the work on any other terms.   So it seems to me."

The reasons which have brought us to the conclusion that the misconduct of the father might be such as to deprive the child of the benefit of the public schools will also apply where the father is dead, and the obligation rests upon the mother and she is guilty of such misconduct.

The question to be now considered is:   What will be the effect of such misconduct by the mother in the lifetime of the father?   While the obligation is upon the father to educate the child, and does not, in the lifetime of the father, in any manner rest upon the mother, still there is an obligation growing out of the relation of husband and wife, and parent and child, resting upon the wife and mother, demanding her co-operation with the husband in everything that is necessary for the welfare of the child. · If the father is, by a good reason, required to abstain from conduct which would injure, and possibly destroy, the entire benefits of the system, the mother, for like reasons, must be required to desist, and her conduct may be a good reason for causing both the child and the father to lose the benefits of the school fund.   This is especially true when we take into consideration the provision of the law of force in this State which declares that "The husband is the head of the family, and the wife is subject to him; her legal existence is merged in the husband, except so far as the law recognizes her separately, either for her own protection, or for her benefit, or for the preservation of public order."

Civil Code, § 2473. It is neither for her protection, nor for her benefit, nor for the preservation of public order, that an act of the character above referred to should be declared to be her separate and independent act; but, on the other hand, public policy demands that the husband should be held responsible for her conduct, and be required to submit to the penalty which it would produce. The same reasons which require that there should be thrown around the father a restraining influence to prevent him from interfering with the operation and discipline of schools require that like restraints should be placed upon the mother.

In a case where the child is free from fault, and the father is obedient to the law, it does look extremely hard that the willful misconduct of the mother should thus bring distress upon two innocent persons; but it is better that they should suffer, than that an institution in operation for the public good should be entirely subverted and destroyed, as would certainly be the result if the mother of every child in attendance on the schools was permitted whenever disposed to enter the school-room and upbraid the teacher in the presence of the pupils.

In the case of Spear v. Cumming, 23 Pick. 224, Chief Justice Shaw, in referring to the power and authority of the school committee under the law of Massachusetts, which corresponds to the board of education in this case, uses the following language: "The general charge and superintendence, in the absence of express legal provisions, includes the power of determining what pupils shall be received and what pupils rejected. The committee may, for good cause, determine that some shall not be received, as, for instance, if infected with any contagious disease, or if the pupil or parent shall refuse to comply with regulations necessary to the discipline and good management of the school."

In the case of Ferriter v. Tyler, 48 Vt. 444, it was held that children might be lawfully excluded from public schools for absence contrary to the rules of the school, notwithstanding such absence was by the authority and command of the parents, who were Roman Catholics, and by direction of the priest, and for the purpose of attending religious services on one of the "holy days" of such church.

In the case of Sherman *v.* Charlestown, 8 Cush. 160, it was held that a child of licentious and immoral character could be excluded from the school, although such character was not manifested by any acts of licentiousness or immorality within the school. In the opinion Chief Justice Shaw says: "On general principles it would seem strange if, in the establishment of such a great public institution as that of the public schools, in the benefits of which the whole community has so deep and vital an interest, there were no power vested anywhere, sufficient to protect the schools thus established from the noxious influence of any one, whose presence and influence would be injurious to the whole and subversive of the purposes manifestly contemplated by their establishment. . . There is no express provision in the law authorizing such exclusion; it results by necessary implication from the provisions of the law, requiring good discipline. It proves that the right to attend is not absolute and unqualified, but one to be enjoyed by all under reasonable conditions."

In the case of Spiller *v.* Woburn, 12 Allen, 127, it was ruled that a school committee of a town may lawfully pass an order that the school shall be opened each morning by reading from the Bible and prayer, and that during the prayer each scholar shall bow the head, unless his parents request that he shall be excused from doing so, and may lawfully exclude from the school a scholar who refuses to comply with such order, and whose parents refuse to request that he be excused from so doing.

In the case of Bourne *v.* State, 52 N. W. (Neb.) 710, a rule which made it the duty of the teacher to keep a record of the standing of each pupil in the studies pursued by him, his attendance and deportment, and to send each month by the pupil a written report of the same to his parent or guardian, and which required such parent or guardian to sign and return the same to the teacher, was held to be reasonable; and the willful refusal on the part of the parent to sign and return the same to the teacher was held to be a sufficient reason for excluding the child from school.

In the case of Fessman *v.* Seeley, 30 S. W. (Tex.) 268, it

was held to be a sufficient reason to exclude a child from school that the father refused to permit the teacher to whip him for misconduct and took no steps himself to correct him. It is true that the school in this case was a private and not a public school, and the right of the plaintiff was predicated upon the contract with the teacher; but it would seem that the same reasons which would constrain the courts to hold that such conduct would be a violation of a contract entered into between a parent and a schoolmaster providing for the education of a child would also require them to hold that such conduct would justify the school authorities in refusing to carry out the agreement impliedly made with the patrons of a public school through the medium of the public-school law.

In the case of Bissell v. Davison, 65 Conn. 183, it was held that a requirement that all children attending the public schools should be properly vaccinated was a reasonable exercise of the police power of the State, and that the validity of the action taken by the school committee did not depend upon the actual existence of smallpox in the town, nor upon a reasonable apprehension of an epidemic of that disease, and that a child who had not been vaccinated was properly excluded from the school, and would not be reinstated by the courts upon the application of the parent. In the opinion Torrance, J., says: "The duty of providing for the education of the children within its limits, through the support and maintenance of public schools, has always been regarded in this State in the light of a governmental duty resting upon the sovereign State. It is a duty not imposed by constitutional provisions, but has always been assumed by the State; not only because the education of youth is a matter of great public utility, but also and chiefly because it is one of great public necessity for the protection and welfare of the State itself. In the performance of this duty, the State maintains and supports at great expense, and with an ever-watchful solicitude, public schools throughout its territory, and secures to its youth the privilege of attendance therein. This is a privilege or advantage, rather than a right in the strict technical sense of the term. This privilege is granted and is to be enjoyed upon such terms and

under such reasonable conditions and restrictions, as the law-making power, within constitutional limits, may see fit to impose; and, within those limits, the question what terms, conditions and restrictions will best subserve the end sought in the establishment and maintenance of public schools is a question solely for the legislature and not for the courts."

In the case of State *v.* Webber, 108 Ind. 31, the school authorities of the city of Laporte adopted a rule requiring each pupil of the high school at stated intervals to employ a certain period of time in the study and practice of music, and for this purpose to provide himself with a prescribed book. The superintendent, notwithstanding a request from the parent that his child might be excused from this exercise, required the pupil to take part in the musical exercises of the school, and upon his refusal to obey, suspended him from school. The only cause or reason assigned by the parent for requiring his son to disobey the rule was that he did not believe it for the best interest of his son to participate in the musical exercises of the school, and did not wish him to do so. The suspension of the pupil was sustained as lawful and authorized, the court using the following language: "The important question arises, which should govern the public high school of the city of Laporte, as to the branches of learning to be taught and the course of instruction therein, the school trustees of such city, to whom the law has confided the direction of these matters, or the mere arbitrary will of the relator, without cause or reason in its support? We are of opinion that only one answer can or ought to be given to this question; the arbitrary wishes of the relator, in the premises, must yield and be subordinated to the governing authorities of the school [of the] city of Laporte, and their reasonable rules and regulations for the government of the pupils of its high school."

In the case of Duffield *v.* Williamsport, 29 Atl. Rep. (Pa.) 742, where a rule of the school board required that pupils should undergo vaccination, the exclusion from the school of a pupil whose parent refused to have him vaccinated was held to be lawful, the rule requiring vaccination being enforced

during the prevalence of an alarm over the report that there was a case of smallpox in the city.

In the case of Guernsey v. Pitkin, 32 Vt. 224, a requirement by the teacher of a district school that the pupils in grammar should write English compositions was held a reasonable one, and expulsion of a pupil who refused to comply with this requirement and produced no request from his parents asking that he be excused was held to be authorized.

In the case of Lander v. Seaver, 32 Vt. 114, it was held that a schoolmaster has in general no right to punish a pupil for misconduct committed after his dismissal from school for the day and return to his home, yet he may on the pupil's return to school punish him for any misbehavior, though committed out of school, which has a direct and immediate tendency to injure the school and to subvert the master's authority.

In the case of King v. Jefferson City School Board, 71 Mo. 628 (s. c. 36 Am. Rep. 499), the court had under consideration the legality of the suspension from the public school of a pupil who had become amenable to a rule which required that "any pupil absent six half-days in four consecutive weeks without satisfactory excuse shall be suspended from school." In the opinion Napton, J., says: "It is said that occasional absences from school on the part of the pupil, or truancy as it is familiarly termed, is of no importance to any one except the pupil or his parents, and its indulgence is therefore not to be attended with such punishment as suspension or expulsion from the school entirely; that every child has a right to the public school, and that that right can not be taken away by a rule of the board; that such rule is subversive of the object of our system of common schools, which was designed to throw open and leave open the doors of the school to all children of the proper age, and give them an opportunity of acquiring such education as will fit them for the after duties of life. This is true, but this right of attending school necessarily requires, when the school is joined, and whilst such attendance continues, a submission to the regulations of the school. . . The pupil, it is urged, is at liberty to be absent when he pleases, and such absence is a matter solely between him and

his parents. . . . Such absences, when without excuse, are the fault of the parents, whose business it is to see that the attendance of their child is regular, unless prevented by causes which will, of course, be an excuse under the rule now in question."

It is true that in all of the cases cited some act was done by the child himself, and therefore they are not exactly identical in their facts with the case under consideration. But the act of the child was generally in obedience to a command of the parent, and the exclusion or suspension of the child from school was brought about by the wrongful conduct of the parent in commanding the child to do the act which was illegal, or in directing the child to refrain from doing that which was lawfully required. So that it may be fairly said that in the cases cited the child was deprived of the benefit of the school by the act of the parent. It will be also gathered from these cases that it is not absolutely essential that there should be a rule which has been in terms violated either by the child, or by the parent. If the act complained of is such that in itself it would be subversive of the good order and discipline in the school, then the mere failure of the board of education to declare that unauthorized which every intelligent man must know could not be allowed, would not prevent the school authorities from dealing with a person who was guilty of such an act. If, however, the act in itself be harmless, but may be harmful on account of the peculiar conditions surrounding the school and its authorities, then there should be a prescribed rule before the act could be complained of as one which would forfeit the right to patronize the schools. It would seem to require no argument to sustain the proposition, that an act of disorder in the schoolroom calculated to bring into contempt the authority of the school, as well as the individual in charge for the time being, should be met with such punishment as would be calculated to impress the pupils with the importance of obedience and respect to constituted authority. Children are too much disposed naturally to look with contempt upon authority, especially when represented by a schoolmaster, and parents should be restrained from encouraging this tendency,

so dangerous in its nature to private and public welfare. It is. admitted by all that in such a case prosecution under the criminal laws of the State would be justified and proper. This would satisfy the public wrong growing out of the violation of the penal laws, but another, and it may not be unwise to say, a greater wrong has been done than the mere infraction of the criminal law. The only adequate remedy for such a wrong is one which will cause the parents of the State to understand that that which is given to them for their benefit primarily, and for the benefit of their children secondarily, will be withdrawn from them and their children whenever they do an act which in its effect will be prejudicial to the system which is. maintained for their benefit. We are aware that it has been held that where a child is excluded unlawfully from a public school, he has, in some cases, a right of action against the public officers, and that the right of action is not in the parent. Donahoe v. Richards, 38 Me. 376, 379; Stephenson v. Hall, 14 Barbour, 222. The right to recover in such action is limited to cases where the public officials acted wantonly or maliciously. McCormick v. Burt, 95 Ill. 263; Dritt v. Snodgrass, 66 Mo. 286. In cases, however, where application was made for reinstatement of the child in the school, it will be generally found that the application was made in the name and in behalf of the parent or guardian. 79 Ill. 567; Bowe v. Bd. of Education, 63 Wis. 234; Holman v. School Dist. No. 5., 6 L. R. A. (Mich.) 534; Bind v. Klinge, 30 Mo. App. 285; Trustees v. Van Allen, 87 Ill. 303.

That the child should have a right of action for being maliciously and wantonly deprived of an education after the parent has entered him in the school is not in conflict with the principle which we contend for in this case. If the child is wantonly and maliciously excluded from the school, his. right of action is entirely consistent with the right which exists in the parent to compel his reinstatement. That the child is damaged there can be no question. His parent is under a duty to educate him; his parent has lawfully placed him at the place provided by law for this education; the parent therefore, and no one but the parent, will be considered

by the law when the question of entering the school and being kept therein is under consideration. The State will not allow any one except the parent to decide the question as to whether the child shall be educated. If the parent decides that the child shall be educated, and the school authorities refuse to admit, or wrongfully exclude him from the benefits of the system provided, the courts will entertain an application to compel admission or reinstatement from no one except the parent or guardian, or some other person occupying a like relation to the child. .While it is the act of the parent or guardian which places the child in the school and puts him in a position where he can obtain the benefits of the system, this does not prevent a duty from arising on the part of the school authorities towards the child to abstain from unlawful conduct which would deprive the child of the benefit which the act of the parent has secured to him. The moment the child is placed in the school this duty arises. A breach of this duty will be a tort for which the child can recover in a proper action against the person wantonly and maliciously depriving him of the benefits which he would receive from the school. Civil Code, § 3807.

The authorities of the public schools under the law owe a duty to the public to admit and keep within the schools all children who come within the lawfully prescribed rules and whose parents or guardians see fit to enter them. When, therefore, such school authorities willfully, wantonly, and maliciously refuse to admit such children, a public wrong is committed, which may be remedied, so far as the public is concerned, by indictment for malpractice, or other appropriate remedy. Out of this breach of duty damage arises to the parent, as well as to the child. The parent therefore has the right to appeal to the courts to compel the child to be admitted or reinstated, as the case may be, and also to appeal to the courts by his action for damages for the amount which he would be required to expend in the education of his child. The child would also have a right against the individuals thus wantonly and maliciously depriving him of the benefit which is secured to him by the law in the event the parent

sees proper to enter him in the school. Broom's Com. Law (9th Lon. ed.), pp. 757–8–9.

When the law requires one to do an act for the benefit of another, or to forbear the doing of that which may injure another, though no action be given in express terms, upon the accrual of damage the party may recover. Civil Code, § 3809. It follows therefore that when a parent enters his child in the public schools, the law requires that the authorities of the school shall do each and every act required by the law which will be for the benefit of the child, and also that the authorities shall refrain from doing any act which will injure the child. If the school authorities wantonly and maliciously refuse to discharge the duty thus imposed upon them, the child will have a right of action against the individuals who commit the wrongful act.

Our conclusion is that the board of education, either in the absence of a rule, or in furtherance of a prescribed rule, had the right to exclude from the schools under its control any child whose parent, in the schoolroom or its vicinity in the presence of such child and other pupils, conducted himself or herself in such manner that their acts were calculated to produce disorder in the school and break down and destroy its discipline. Under the facts set up in the answer of the board of education in this case, it was not only authorized, but it was its duty, to suspend the children of the defendants in error from the school. The trial judge erred in granting the mandamus and reinstating the children.

Cases and authorities which, though not in all respects pertinent to the matter dealt with in the above opinion, relate to questions arising out of "school laws": Learock v. Putnam, 111 Mass. 499; Roe v. Deming, 21 Ohio St. 666; Anderson v. State, 3 Head, 455; Fertick v. Michener, 111 Ind. 472; State v. Osborne, 24 Mo. App. 309; Bd. of Education v. Minor, 23 Ohio, 211; Davis v. Barton, 133 Mass. 103; Churchill v. Fewkes, 13 Ill. App. 520; Burdick v. Babcock, 31 Ia. 562; King v. Jefferson School Bd., 71 Mo. 628; Sewell v. Bd. Education, 29 Ohio St. 89; Reck v. Smith, 41 Conn. 442; Bd. Education v. Holston, 32 Ill. App. 300; Mack v. Kelsey, 17

A. (Vt.) 780; Perkins *v.* School Dist., 56 Iowa, 476; Patterson *v.* Nutter, 78 Me. 509; State *v.* Mizner, 45 Iowa, 248; Stevens *v.* Fassett, 27 Me. 266; Heritage *v.* Dodge, 9 A. (N. H.) 722; Duskins *v.* Gore, 85 Mo. 485; Holston *v.* State, 5 S. W. 122; Balding *v.* State, 4 S. W. 122; Commonwealth *v.* Seed, 5 Pa. (L. J. R.) 78; Donenhoffer *v.* State, 69 Ind. 295; Vancouver *v.* State, 15 N. E. 341; 2 Kent's Com. 203; Morrow *v.* Wood, 35 Wis. 59; Reeves Dom. Rel., 4th ed. 357–8; Russell *v.* Lunfield, 116 Mass. 366; Hodgkins *v.* Rockport, 105 Mass. 476; Scott *v.* School Dist. 46 Vt. 452; Sheehan *v.* Sturges, 53 Conn. 481; Thompson *v.* Beaver, 63 Ill. 356; Trustees *v.* People, 87 Ill. 303; Murphy *v.* Directors, 30 Iowa, 429; Perkins *v.* Directors, 56 Iowa, 476; Parker *v.* School Dist., 5 Lea (Tenn.), 525; Cooper *v.* McJunkin, 4 Ind. 290; Hathaway *v.* Rice, 19 Vt. 102; Ward *v.* Flood, 48 Cal. 36; Huse *v.* Lowell, 10 Allen, 150; Kidder *v.* Chellis, 59 N. H. 473; Metcalf *v.* State, 21 Tex. App. 174; Thompson *v.* Beaver, 63 Ill. 353; Roberson *v.* Trout, 17 Ill. App. 386; State *v.* Bd. Ed., 63 Wis. 234; Abeel *v.* Clark, 84 Cal. 226; Com. *v.* Cooke, 7 Am. Law Reg. 417; Moore *v.* Monroe, 64 Iowa, 367; Bishop's Non-contract Law, §§ 593–4–5–6; Weaver *v.* Devendorf, 3 Denio, 120; Reed *v.* Conway, 20 Mo. 52; Tifft *v.* Tifft, 4 Denio, 175; State *v.* School Dist., 31 Neb. 552; Wilkes *v.* Dinsman, 7 How. 89; State *v.* Burton; 45 Wis. 155; Norton *v.* Tinmouth, 37 Vt. 521; Blanchard *v.* Stearns, 5 Met. 298; Griffin *v.* Rising, 11 Met. 339; Stewart *v.* Southard, 17 Ohio, 402; Dawson *v.* Lent, 6 Cal. 94; Hines *v.* Lockport, 50 N. Y. 489; Matter of Church St., 49 Barb. 455; Jordon *v.* Hanson, 49 N. H. 199; Gregory *v.* Burke, 37 Conn. 365; Wilson *v.* Mayor, 1 Den. 599; Kendall *v.* Stokes, 3 How. 387; Roberts *v.* Boston, 5 Cush. 198; People *v.* Bd. Ed., 18 Mich. 400; Allen *v.* Blunt, 3 Story, 141; Lincoln *v.* Hapgood, 11 Mass. 350; Wheeler *v.* Patterson, 1 N. H. 88; Jenkins *v.* Waldon, 11 Johns. 114; Roie *v.* Potts, 8 Humph. 225; Copen *v.* Foster, 12 Pick. 485; Gates *v.* Neal, 23 Pick. 308.

*Judgment reversed.   Atkinson and Little, JJ., dissenting; the other Justices concurring.*