WOOD ET AL. *v.* STRICKLAND ET AL.

No. 73–1285.   Argued October 16, 1974—Decided February 25, 1975

*G. Ross Smith* argued the cause for petitioners. With him on the brief was *Herschel H. Friday.*

*Ben Core* argued the cause and filed a brief for respondents.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Respondents Peggy Strickland and Virginia Crain brought this lawsuit against petitioners, who were members of the school board at the time in question, two school administrators, and the Special School District of Mena, Ark.,[1] purporting to assert a cause of action

---

*F. Raymond Marks* filed a brief for the Childhood and Government Project as *amicus curiae.*

[1] The Court of Appeals affirmed the directed verdicts awarded by the District Court to P. T. Waller, the principal of Mena Public High School at the time in question, S. L. Inlow, then superintendent of schools, and the Mena Special School District. 485 F. 2d 186, 191 (CA8 1973). Since respondents have not cross-petitioned, the cases of these three parties are not before the Court.

under 42 U. S. C. § 1983, and claiming that their federal constitutional rights to due process were infringed under color of state law by their expulsion from the Mena Public High School on the grounds of their violation of a school regulation prohibiting the use or possession of intoxicating beverages at school or school activities. The complaint as amended prayed for compensatory and punitive damages against all petitioners, injunctive relief allowing respondents to resume attendance, preventing petitioners from imposing any sanctions as a result of the expulsion, and restraining enforcement of the challenged regulation, declaratory relief as to the constitutional invalidity of the regulation, and expunction of any record of their expulsion. After the declaration of a mistrial arising from the jury's failure to reach a verdict, the District Court directed verdicts in favor of petitioners on the ground that petitioners were immune from damages suits absent proof of malice in the sense of ill will toward respondents. 348 F. Supp. 244 (WD Ark. 1972). The Court of Appeals, finding that the facts showed a violation of respondents' rights to "substantive due process," reversed and remanded for appropriate injunctive relief [2] and a new trial on the question of damages. 485 F. 2d 186 (CA8 1973). A petition for rehearing en banc was denied, with three judges dissenting. See *id.,* at 191. Certiorari was granted to consider whether this application of due process by the Court of Appeals was warranted and whether that court's expression of a standard governing immunity for school board members from lia-

---

[2] The Court of Appeals noted that reinstatement was no longer possible since the term of expulsion had ended, but that the respondents were entitled to have the records of the expulsions expunged and to be relieved of any other continuing punishment, if any. *Id.,* at 190.

bility for compensatory damages under 42 U. S. C. § 1983 was the correct one. 416 U. S. 935 (1974).

## I

The violation of the school regulation [3] prohibiting the use or possession of intoxicating beverages at school or school activities with which respondents were charged concerned their "spiking" of the punch served at a meeting of an extracurricular school organization attended by parents and students. At the time in question, respondents were 16 years old and were in the 10th grade. The relevant facts begin with their discovery that the punch had not been prepared for the meeting. as previously planned. The girls then agreed to "spike" it. Since the county in which the school is located is "dry," respondents and a third girl drove across the state border into Oklahoma and purchased two 12-ounce bottles of "Right Time," a malt liquor. They then bought six 10-ounce bottles of a soft drink, and, after having mixed the contents of the eight bottles in an empty milk carton, returned to school. Prior to the meeting, the girls experienced second thoughts about the wisdom of their prank, but by then they were caught up in the force of events and the intervention of other girls prevented them from disposing of the illicit punch. The punch was served at the meeting, without apparent effect.

---

[3] "3. Suspension

.     .     .     .     .

"b. Valid causes for suspension from school on first offense: Pupils found to be guilty of any of the following shall be suspended from school on the first offense for the balance of the semester and such suspension will be noted on the permanent record of the student along with reason for suspension.

.     .     .     .     .

"(4) The use of intoxicating beverage or possession of same at school or at a school sponsored activity." App. 102.

312

Ten days later, the teacher in charge of the extracurricular group and meeting, Mrs. Curtis Powell, having heard something about the "spiking," questioned the girls about it. Although first denying any knowledge, the girls admitted their involvement after the teacher said that she would handle the punishment herself. The next day, however, she told the girls that the incident was becoming increasingly the subject of talk in the school and that the principal, P. T. Waller, would probably hear about it. She told them that her job was in jeopardy but that she would not force them to admit to Waller what they had done. If they did not go to him then, however, she would not be able to help them if the incident became "distorted." The three girls then went to Waller and admitted their role in the affair. He suspended them from school for a maximum two-week period, subject to the decision of the school board. Waller also told them that the board would meet that night, that the girls could tell their parents about the meeting, but that the parents should not contact any members of the board.

Neither the girls nor their parents attended the school board meeting that night. Both Mrs. Powell and Waller, after making their reports concerning the incident, recommended leniency. At this point, a telephone call was received by S. L. Inlow, then the superintendent of schools, from Mrs. Powell's husband, also a teacher at the high school, who reported that he had heard that the third girl involved had been in a fight that evening at a basketball game. Inlow informed the meeting of the news, although he did not mention the name of the girl involved. Mrs. Powell and Waller then withdrew their recommendations of leniency, and the board voted to expel the girls from school for the remainder of the semester, a period of approximately three months.

The board subsequently agreed to hold another meet-

ing on the matter, and one was held approximately two weeks after the first meeting. The girls, their parents, and their counsel attended this session. The board began with a reading of a written statement of facts as it had found them.[4] The girls admitted mixing the malt liquor into the punch with the intent of "spiking" it, but asked the board to forgo its rule punishing such violations by such substantial suspensions. Neither Mrs. Powell nor Waller was present at this meeting. The board voted not to change its policy and, as before, to expel the girls for the remainder of the semester.[5]

## II

The District Court instructed the jury that a decision for respondents had to be premised upon a finding that

---

[4]     "FACTS FOUND BY SCHOOL BOARD

"1. That Virginia Crain, Peggy Strickland and Jo Wall are students of Mena High School and subject to the governing rules and policies of Mena High School.

"2. That on or about February 7, 1972 these three girls were charged with the responsibility of providing refreshments for a school function, being a gathering of students of the Home Economic class and some of their parents, on school premises, being the auditorium building of Mena High School, and being under the direction of Mrs. Curtis Powell.

"3. That the three girls in question traveled to Oklahoma, purchased a number of bottles of malt liquor, a beer type beverage, and later went onto school premises with the alcoholic beverage and put two or more of the bottles of the drink into the punch or liquid refreshment which was to be served to members of the class and parents." App. 137.

The Court of Appeals in its statement of the facts observed that the malt liquor and soft drinks were mixed by the girls prior to their return to school, 485 F. 2d, at 187, and petitioners in their brief recite the facts in this manner. Brief for Petitioners 5. This discrepancy in the board's findings of fact is not material to any issue now before the Court.

[5] By taking a correspondence course and an extra course later, the girls were able to graduate with their class. Tr. of Oral Arg. 38–39.

petitioners acted with malice in expelling them and defined "malice" as meaning "ill will against a person— a wrongful act done intentionally without just cause or excuse." 348 F. Supp., at 248. In ruling for petitioners after the jury had been unable to agree, the District Court found "as a matter of law" that there was no evidence from which malice could be inferred. *Id.*, at 253.

The Court of Appeals, however, viewed both the instruction and the decision of the District Court as being erroneous. Specific intent to harm wrongfully, it held, was not a requirement for the recovery of damages. Instead, "[i]t need only be established that the defendants did not, in the light of all the circumstances, act in good faith. The test is an objective, rather than a subjective, one." 485 F. 2d, at 191 (footnote omitted).

Petitioners as members of the school board assert here, as they did below, an absolute immunity from liability under § 1983 and at the very least seek to reinstate the judgment of the District Court. If they are correct and the District Court's dismissal should be sustained, we need go no further in this case. Moreover, the immunity question involves the construction of a federal statute, and our practice is to deal with possibly dispositive statutory issues before reaching questions turning on the construction of the Constitution. Cf. *Hagans* v. *Lavine,* 415 U. S. 528, 549 (1974).[6] We essentially sustain the position of the Court of Appeals with respect to the immunity issue.

---

[6] In their original complaint, respondents sought only injunctive and declaratory relief. App. 11–12. In their amended complaint, they added a prayer for compensatory and punitive damages. *Id.*, at 92. Trial was to a jury; and the District Court in ruling on motions after declaring a mistrial appears to have treated the case as having developed into one for damages only since it entered judgment for petitioners and dismissed the complaint on the basis of their good-faith defense. In a joint motion for a new trial, respondents specifically argued that the District Court had erred in treating the case as one

The nature of the immunity from awards of damages under § 1983 available to school administrators and school board members is not a question which the lower federal courts have answered with a single voice. There is general agreement on the existence of a "good faith" immunity, but the courts have either emphasized different factors as elements of good faith or have not given specific content to the good-faith standard.[7]

for the recovery of damages only and in failing to give them a trial and ruling on their claims for injunctive and declaratory relief. *Id.,* at 131. The District Court denied the motion. *Id.,* at 133. Upon appeal, respondents renewed these contentions, and the Court of Appeals, after finding a substantive due process violation, directed the District Court to give respondents an injunction requiring expunction of the expulsion records and restraining any further continuing punishment. 485 F. 2d, at 190. Petitioners urge that we reverse the Court of Appeals and order the complaint dismissed. Brief for Petitioners 48. Respondents, however, again stress that the relief they sought included equitable relief. Brief for Respondents 47–48, 50.

In light of the record in this case, we are uncertain as to the basis for the District Court's judgment, for immunity from damages does not ordinarily bar equitable relief as well. The opinion of the Court of Appeals does not entirely dispel this uncertainty. With the case in this posture, it is the better course to proceed directly to the question of the immunity of school board members under § 1983.

[7] In *McLaughlin* v. *Tilendis,* 398 F. 2d 287, 290–291 (CA7 1968), a case relied upon by the Court of Appeals below, the immunity was extended to school board members and the superintendent of schools only to the extent that they could establish that their decisions were founded on "justifiable grounds." Cf. *Scoville* v. *Board of Ed. of Joliet Township,* 425 F. 2d 10, 15 (CA7), cert. denied, 400 U. S. 826 (1970). In *Smith* v. *Losee,* 485 F. 2d 334, 344 (CA10 1973) (en banc), cert. denied, 417 U. S. 908 (1974), the immunity protecting university officials was described as one of good faith and the absence of malice where the facts before the officials "showed a good and valid reason for the decision although another reason or reasons advanced for nonrenewal or discharge may have been constitutionally impermissible." The District Court in *Kirstein* v. *Rector and Visitors of University of Virginia,* 309 F. Supp. 184, 189 (ED Va.

This Court has decided three cases dealing with the scope of the immunity protecting various types of governmental officials from liability for damages under § 1983. In *Tenney* v. *Brandhove,* 341 U. S. 367 (1951), the question was found to be one essentially of statutory construction.[8] Noting that the language of § 1983 is silent with

---

1970), extended the immunity to action taken in good faith and in accordance with "long standing legal principle." See also *Skehan* v. *Board of Trustees of Bloomsburg State College,* 501 F. 2d 31, 43 (CA3 1974); *Handverger* v. *Harvill,* 479 F. 2d 513, 516 (CA9), cert. denied, 414 U. S. 1072 (1973); *Wood* v. *Goodman,* 381 F. Supp. 413, 419 (Mass. 1974); *Thonen* v. *Jenkins,* 374 F. Supp. 134, 140 (EDNC 1974); *Taliaferro* v. *State Council of Higher Education,* 372 F. Supp. 1378, 1382–1383 (ED Va. 1974); *Vanderzanden* v. *Lowell School District No. 71,* 369 F. Supp. 67, 72 (Ore. 1973); *Jones* v. *Jefferson County Board of Education,* 359 F. Supp. 1081, 1083–1084 (ED Tenn. 1972); *Adamian* v. *University of Nevada,* 359 F. Supp. 825, 834 (Nev. 1973); *Boyd* v. *Smith,* 353 F. Supp. 844, 845–846 (ND Ind. 1973); *Hayes* v. *Cape Henlopen School District,* 341 F. Supp. 823, 829 (Del. 1972); *Schreiber* v. *Joint School District No. 1, Gibraltar, Wis.,* 335 F. Supp. 745, 748 (ED Wis. 1972); *Endicott* v. *Van Petten,* 330 F. Supp. 878, 885–886 (Kan. 1971); *Holliman* v. *Martin,* 330 F. Supp. 1, 13 (WD Va. 1971); *McDonough* v. *Kelly,* 329 F. Supp. 144, 150–151 (NH 1971); *Cordova* v. *Chonko,* 315 F. Supp. 953, 964 (ND Ohio 1970); *Gouge* v. *Joint School District No. 1,* 310 F. Supp. 984, 990, 992–993 (WD Wis. 1970).

[8] "Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity? Let us assume, merely for the moment, that Congress has constitutional power to limit the freedom of State legislators acting within their traditional sphere. That would be a big assumption. But we would have to make an even rasher assumption to find that Congress thought it had exercised the power. These are difficulties we cannot hurdle. The limits of §§ 1 and 2 of the 1871 statute . . . were not spelled out in debate. We cannot believe that Congress—itself a

respect to immunities, the Court concluded that there was no basis for believing that Congress intended to eliminate the traditional immunity of legislators from civil liability for acts done within their sphere of legislative action. That immunity, "so well grounded in history and reason . . . ," 341 U. S., at 376, was absolute and consequently did not depend upon the motivations of the legislators. In *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967), finding that "[t]he legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities" in enacting § 1983, we concluded that the common-law doctrine of absolute judicial immunity survived. Similarly, § 1983 did not preclude application of the traditional rule that a policeman, making an arrest in good faith and with probable cause, is not liable for damages, although the person arrested proves innocent. Consequently the Court said: "Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied." 386 U. S., at 555 (footnote omitted). Finally, last Term we held that the chief executive officer of a State, the senior and subordinate officers of the State's National Guard, and the president of a state-controlled university were not absolutely immune from liability under § 1983, but instead were entitled to immunity, under prior precedent and in light of the obvious need to avoid discouraging effective official action by public officers charged with a considerable range of responsibility

---

staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." 341 U. S., at 376.

and discretion, only if they acted in good faith as defined by the Court:

> "[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer* v. *Rhodes,* 416 U. S. 232, 247–248 (1974).

Common-law tradition, recognized in our prior decisions, and strong public-policy reasons also lead to a construction of § 1983 extending a qualified good-faith immunity to school board members from liability for damages under that section. Although there have been differing emphases and formulations of the common-law immunity of public school officials in cases of student expulsion or suspension, state courts have generally recognized that such officers should be protected from tort liability under state law for all good-faith, nonmalicious action taken to fulfill their official duties.[9]

---

[9] See *Donahoe* v. *Richards,* 38 Me. 379 (1854); *Dritt* v. *Snodgrass,* 66 Mo. 286 (1877); *McCormick* v. *Burt,* 95 Ill. 263 (1880); *Board of Education of Cartersville* v. *Purse,* 101 Ga. 422, 28 S. E. 896 (1897); *Board of Ed. of City of Covington* v. *Booth,* 110 Ky. 807, 62 S. W. 872 (1901); *Morrison* v. *City of Lawrence,* 181 Mass. 127, 63 N. E. 400 (1902); *Sorrels* v. *Matthews,* 129 Ga. 319, 58 S. E. 819 (1907); *Douglass* v. *Campbell,* 89 Ark. 254, 116 S. W. 211 (1909); *Barnard* v. *Shelburne,* 216 Mass. 19, 102 N. E. 1095 (1913); *Sweeney* v. *Young,* 82 N. H. 159, 131 A. 155 (1925) (absolute immunity for acts taken within range of general authority). See

As the facts of this case reveal, school board members function at different times in the nature of legislators and adjudicators in the school disciplinary process. Each of these functions necessarily involves the exercise of discretion, the weighing of many factors, and the formulation of long-term policy.[10] "Like legislators and judges, these officers are entitled to rely on traditional sources for the factual information on which they decide and act." *Scheuer* v. *Rhodes, supra,* at 246 (footnote omitted). As with executive officers faced with instances of civil disorder, school officials, confronted with student behavior causing or threatening disruption, also have an "obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others." *Ibid.*

Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties. School board members, among other duties, must judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations. Denying any measure of immunity in these circumstances "would contribute not to principled and fearless decision-making but to intimidation." *Pierson* v. *Ray, supra,* at 554. The imposition of monetary costs for mistakes which were not unreasonable in the light of all the circumstances would undoubtedly deter even the

also 68 Am. Jur. 2d, Schools § 268, pp. 592–593 (1973); 79 C. J. S., Schools and School Districts § 503 (d), p. 451 (1952); W. Prosser, Law of Torts § 132, p. 989 (4th ed. 1971); R. Hamilton & E. Reutter, Legal Aspects of School Board Operation 190–191 (1958).

[10] See generally R. Campbell, L. Cunningham, & R. McPhee, The Organization and Control of American Schools 177–182 (1965).

most conscientious school decisionmaker from exercising his judgment independently, forcefully, and in a manner best serving the long-term interest of the school and the students. The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure.[11]

These considerations have undoubtedly played a prime role in the development by state courts of a qualified immunity protecting school officials from liability for damages in lawsuits claiming improper suspensions or expulsions.[12] But at the same time, the judgment implicit in this common-law development is that absolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations.

*Tenney* v. *Brandhove, Pierson* v. *Ray,* and *Scheuer* v. *Rhodes* drew upon a very similar background and were

---

[11] The overwhelming majority of school board members are elected to office. See A. White, Local School Boards: Organization and Practices 8 (U. S. Office of Education, OE–23023, Bulletin No. 8, 1962); National School Boards Association, Survey of Public Education in the Member Cities of the Council of Big City Boards of Education 3 (Nov. 1968); Campbell, Cunningham, & McPhee, *supra,* n. 10, at 164–170. Most of the school board members across the country receive little or no monetary compensation for their service. White, *supra,* at 67–79; National School Boards Association, *supra,* at 3, 15–21; Campbell, Cunningham, & McPhee, *supra,* at 172.

[12] "[School directors] are authorized, and it is their duty to adopt reasonable rules for the government and management of the school, and it would deter responsible and suitable men from accepting the position, if held liable for damages to a pupil expelled under a rule adopted by them, under the impression that the welfare of the school demanded it, if the courts should deem it improper." *Dritt* v. *Snodgrass,* 66 Mo., at 293.

animated by a very similar judgment in construing § 1983. Absent legislative guidance, we now rely on those same sources in determining whether and to what extent school officials are immune from damage suits under § 1983. We think there must be a degree of immunity if the work of the schools is to go forward; and, however worded, the immunity must be such that public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity.

> "Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all." *Scheuer* v. *Rhodes,* 416 U. S., at 241–242 (footnote omitted).

The disagreement between the Court of Appeals and the District Court over the immunity standard in this case has been put in terms of an "objective" versus a "subjective" test of good faith. As we see it, the appropriate standard necessarily contains elements of both. The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are "charged with predicting the future course of constitutional law." *Pierson* v. *Ray,* 386 U. S., at 557. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

### III

The Court of Appeals, based upon its review of the facts but without the benefit of the transcript of the testimony given at the four-day trial to the jury in the Dis-

trict Court,[13] found that the board had made its decision to expel the girls on the basis of *no* evidence that the school regulation had been violated:

> "To justify the suspension, it was necessary for the Board to establish that the students possessed or used an 'intoxicating' beverage at a school-sponsored activity. No evidence was presented at either meeting to establish the alcoholic content of the liquid brought to the campus. Moreover, the Board made no finding that the liquid was intoxicating. The only evidence as to the nature of the drink was that supplied by the girls, and it is clear that they did not know whether the beverage was intoxicating or not." 485 F. 2d, at 190.

Although it did not cite the case as authority, the Court of Appeals was apparently applying the due process rationale of *Thompson* v. *City of Louisville,* 362 U. S. 199, 206 (1960),[14] to the public school disciplinary process. The applicability of *Thompson* in this setting, however, is an issue that need not be reached in this case.[15] The record reveals that the decision of the Court of Appeals

---

[13] At the time of the Court of Appeals decision, the testimony at the trial to the jury had not been transcribed because of counsel's concern with limiting litigation costs. Tr. of Oral Arg. 23. The transcript was filed in the District Court after certiorari was granted. App. 120 n. 2.

[14] See also *Vachon* v. *New Hampshire,* 414 U. S. 478, 480 (1974); *Gregory* v. *Chicago,* 394 U. S. 111, 112 (1969); *Johnson* v. *Florida,* 391 U. S. 596, 598–599 (1968); *Shuttlesworth* v. *City of Birmingham,* 382 U. S. 87, 94–95 (1965); *Garner* v. *Louisiana,* 368 U. S. 157 (1961). Cf. *Boilermakers* v. *Hardeman,* 401 U. S. 233, 246 (1971).

[15] That is not to say that the requirements of procedural due process do not attach to expulsions. Over the past 13 years the Courts of Appeals have without exception held that procedural due process requirements must be satisfied if a student is to be expelled. See *Goss* v. *Lopez,* 419 U. S. 565, 576–578, n. 8 (1975).

was based upon an erroneous construction of the school regulation in question. Once that regulation is properly construed, the *Thompson* issue disappears.

The Court of Appeals interpreted the school regulation prohibiting the use or possession of intoxicating beverages as being linked to the definition of "intoxicating liquor" under Arkansas statutes [16] which restrict the term to beverages with an alcoholic content exceeding 5% by weight.[17] Testimony at the trial, however, established convincingly that the term "intoxicating beverage" in the school regulation was not intended at the time of its adoption in 1967 to be linked to the definition in the state statutes or to any other technical definition of "intoxicating." [18] The adop-

---

[16] See Ark. Stat. Ann. §§ 48–107, 48–503 (1964).

[17] The Court of Appeals referred to comments which seemed also to adopt this construction made by the District Court in its findings of fact when it denied respondents' motion for a preliminary injunction. 485 F. 2d, at 190; App. 80. After noting the District Court's initial view that petitioners would find it difficult to prove the requisite alcoholic content, the Court of Appeals expressed puzzlement at the failure of the lower court to discuss the absence of such evidence in its final opinion. The District Court, however, indicated in its instructions that the question of the proper construction of the regulation would not be relevant if the jury found that the school officials in good faith considered the malt liquor and punch to fall within the regulation. 348 F. Supp., at 248. The District Court's ultimate conclusion apparently made unnecessary a final decision on the coverage of the regulation.

Despite its construction of the present regulation, the Court of Appeals indicated that the school board had the authority to prohibit the use and possession of *alcoholic* beverages or to continue its policy of proscribing only *intoxicating* beverages. 485 F. 2d, at 191.

[18] Two members of the school board at the time that the regulation was adopted testified that there had been no discussion of tying the regulation to the State Alcohol Control Act and that the intent of the board members was to cover beer. Tr. 466–467 (testimony of petitioner Wood); *id.,* at 589–590 (testimony of Mrs. Gerald Goforth).

tion of the regulation was at a time when the school board was concerned with a previous beer-drinking episode.[19] It was applied prior to respondents' case to another student charged with possession of beer.[20] In its statement of facts issued prior to the onset of this litigation, the school board expressed its construction of the regulation by finding that the girls had brought an "alcoholic beverage" onto school premises.[21] The girls themselves admitted knowing at the time of the incident that they were doing something wrong which might be punished.[22] In light of this evidence, the Court of Appeals was ill advised to supplant the interpretation of the regulation of those officers who adopted it and are entrusted with its enforcement. Cf. *Grayned* v. *City of Rockford,* 408 U. S. 104, 110 (1972).

When the regulation is construed to prohibit the use and possession of beverages containing alcohol, there was no absence of evidence before the school board to prove the charge against respondents. The girls had admitted that they intended to "spike" the punch and that they had mixed malt liquor into the punch that was served. The third girl estimated at the time of their admissions to Waller that the malt liquor had an alcohol content of 20%. After the expulsion decision had been made and this

---

[19] See the minutes of the board meeting at which the regulation was adopted in App. 103–104. See also Tr. 431–432 (testimony of Mrs. Mary L. Spencer, also a board member when the regulation was adopted); *id.,* at 587–588 (Mrs. Goforth).

[20] The student was suspended in October 1971 for the possession of beer at a school activity. There is no indication in the record of the alcoholic content of the beer. See Tr. 258–259, 268–269 (testimony of former Superintendent Inlow).

[21] See n. 4, *supra.* Soon after this litigation had begun, the board issued a statement which said that the regulation "prohibits the use and possession of alcoholic beverage on school premises . . . ." App. 139.

[22] See Tr. 75 (Strickland); *id.,* at 119, 121 (Crain).

litigation had begun, it was conclusively determined that the malt liquor in fact had an alcohol content not exceeding 3.2% by weight.[23]   Testimony at trial put the alcohol content of the punch served at 0.91%.[24]

Given the fact that there *was* evidence supporting the charge against respondents, the contrary judgment of the Court of Appeals is improvident.   It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.   Public high school students do have substantive and procedural rights while at school. See *Tinker* v. *Des Moines Independent Community School District,* 393 U. S. 503 (1969); *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624 (1943); *Goss* v. *Lopez,* 419 U. S. 565 (1975). But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations.   The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.   See *Epperson* v. *Arkansas,* 393 U. S. 97, 104 (1968); *Tinker, supra,* at 507.

## IV

Respondents' complaint alleged that their procedural due process rights were violated by the action taken by petitioners.   App. 9.   The District Court did not discuss

---

[23] This percentage content was established through the deposition of an officer of the company that produces "Right Time" malt liquor. App. 93–94.

[24] Tr. 205 (testimony of Dr. W. F. Turner).

this claim in its final opinion, but the Court of Appeals viewed it as presenting a substantial question. It concluded that the girls were denied procedural due process at the first school board meeting, but also intimated that the second meeting may have cured the initial procedural deficiencies. Having found a substantive due process violation, however, the court did not reach a conclusion on this procedural issue. 485 F. 2d, at 190.

Respondents have argued here that there was a procedural due process violation which also supports the result reached by the Court of Appeals. Brief for Respondents 27–28, 36. But because the District Court did not discuss it, and the Court of Appeals did not decide it, it would be preferable to have the Court of Appeals consider the issue in the first instance.

The judgment of the Court of Appeals is vacated and the case remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I join in Parts I, III, and IV of the Court's opinion, and agree that the judgment of the Court of Appeals should be vacated and the case remanded. I dissent from Part II which appears to impose a higher standard of care upon public school officials, sued under § 1983, than that heretofore required of any other official.

The holding of the Court on the immunity issue is set forth in the margin.[1] It would impose personal

---

[1] "The disagreement between the Court of Appeals and the District Court over the immunity standard in this case has been put in terms of an 'objective' versus a 'subjective' test of good faith. As we see it, the appropriate standard necessarily contains elements of both. The official himself must be acting sincerely and with a belief that

liability on a school official who acted sincerely and in the utmost good faith, but who was found—after the fact—to have acted in "ignorance . . . of settled, indisputable law." *Ante,* at 321. Or, as the Court also puts it, the school official must be held to a standard of conduct based not only on good faith "but also on knowledge of the basic, unquestioned constitutional rights of his charges." *Ante,* at 322. Moreover, ignorance of the law is explicitly equated with "actual malice." *Ante,* at 321.

---

he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard neither imposes an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are 'charged with predicting the future course of constitutional law.' *Pierson* v. *Ray,* 386 U. S. [547, 557 (1967).] A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." *Ante,* at 321–322.

This harsh standard, requiring knowledge of what is characterized as "settled, indisputable law," leaves little substance to the doctrine of qualified immunity. The Court's decision appears to rest on an unwarranted assumption as to what lay school officials know or can know about the law and constitutional rights. These officials will now act at the peril of some judge or jury subsequently finding that a good-faith belief as to the applicable law was mistaken and hence actionable.[2]

The Court states the standard of required knowledge in two cryptic phrases: "settled, indisputable law" and "unquestioned constitutional rights." Presumably these are intended to mean the same thing, although the meaning of neither phrase is likely to be self-evident to constitutional law scholars—much less the average school board member. One need only look to the decisions of this Court—to our reversals, our recognition of evolving concepts, and our five-to-four splits—to recognize the hazard of even informed prophecy as to what are "unquestioned constitutional rights." Consider, for example, the recent five-to-four decision in *Goss* v. *Lopez,* 419 U. S. 565 (1975), holding that a junior high school pupil routinely suspended for as much as a single day is entitled to due process. I suggest that most lawyers and judges would have thought, prior to that decision, that the law to the *contrary* was settled, indisputable, and unquestioned.[3]

---

[2] The opinion indicates that actual malice is presumed where one acts in ignorance of the law; thus it would appear that even good-faith reliance on the advice of counsel is of no avail.

[3] The Court's rationale in *Goss* suggests, for example, that school officials may infringe a student's right to education if they place him in a noncollege-preparatory track or deny him promotion with his class without affording a due process hearing. See 419 U. S., at 597–599 (POWELL, J., dissenting). Does this mean that school officials who fail to provide such hearings in the future will be

Less than a year ago, in *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974), and in an opinion joined by all participating members of the Court, a considerably less demanding standard of liability was approved with respect to two of the highest officers of the State, the Governor and Adjutant General. In that case, the estates of students killed at Kent State University sued these officials under § 1983. After weighing the competing claims, the Court concluded:

> "These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. *It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.*" 416 U. S., at 247–248. (Emphasis added.)

The italicized sentence from *Scheuer* states, as I view it, the correct standard for qualified immunity of a government official: whether in light of the discretion and responsibilities of his office, and under all of the circumstances as they appeared at the time, the officer acted reasonably and in good faith. This was the standard

liable under § 1983 if a court subsequently determines that they were required?

For another current example of how unsettled constitutional law, deemed by some at least to be quite settled, may turn out to be, see the decision and opinions in *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.,* 419 U. S. 601 (1975), and compare with MR. JUSTICE STEWART's dissent in *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600, 629 (1974).

applied to the Governor of a State charged with maliciously calling out National Guardsmen who killed and wounded Kent State students.[4] Today's opinion offers no reason for imposing a more severe standard on school board members charged only with wrongfully expelling three teenage pupils.

There are some 20,000 school boards, each with five or more members, and thousands of school superintendents and school principals. Most of the school board members are popularly elected, drawn from the citizenry at large, and possess no unique competency in divining the law. Few cities and counties provide any compensation for service on school boards, and often it is difficult to persuade qualified persons to assume the burdens of this important function in our society. Moreover, even if counsel's advice constitutes a defense, it may safely be assumed that few school boards and school officials have ready access to counsel or indeed have deemed it necessary to consult counsel on the countless decisions that necessarily must be made in the operation of our public schools.

In view of today's decision significantly enhancing the possibility of personal liability, one must wonder whether qualified persons will continue in the desired numbers to volunteer for service in public education.

---

[4] The decision of the Court in *Scheuer* with respect to qualified immunity is consistent with Mr. Chief Justice Warren's opinion for the Court in *Pierson* v. *Ray*, 386 U. S. 547 (1967), where it was said: "If the jury believed the testimony of the officers and disbelieved that of the ministers, and if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional." *Id.*, at 557.

As in *Scheuer*, the standard prescribed is one of acting in good faith in accordance with reasonable belief that the action was lawful and justified. Not even police officers were held liable for ignorance of "settled, indisputable law."