**Benson ANABLE; Laura Balch; and Dan Pless, Individually and as Father and Next Friend of Matthew Pless, a Minor, Plaintiffs,**

v.

**James H. FORD, Individually and in His Official Capacity as Superintendent of the Arkadelphia School District; and Mary Francis, Kenneth Harris, Floyd Manning, Don Pennington, and Michael V. O'Quinn as Individuals and in Their Official Capacity as Directors of the Arkadelphia School District; and the Arkadelphia School District, Defendants.**

Civ. No. 84–6033.

United States District Court,
W.D. Arkansas,
Hot Springs Division.

Sept. 6, 1985.

Clayton Blackstock and Robert M. Cearley, Jr., Cearley, Mitchell & Roachell, Little Rock, Ark., for plaintiffs.

Ed W. McCorkle, McMillan, Turner & McCorkle, Arkadelphia, Ark. and Robert V. Light, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Subsequent to this court's memorandum opinion and judgment dated July 12, 1985, 653 F.Supp. 22, defendants moved, pursuant to Rule 59(e), Fed.R.Civ.P., to alter or amend the judgment so as to vacate the injunction as "moot," amend the injunction to describe with more specificity what acts are enjoined, and to dismiss plaintiffs' complaint as to the individual defendants because of a "good faith" defense. Plaintiffs have timely responded and the issues will be discussed in turn.

### I. Mootness

Defendants argue that because plaintiff Balch is a former student she lacks standing to seek any injunctive relief in her own behalf, and that because the only plaintiff who is a current student, Pless, was awarded no relief, the issue of prospective injunctive relief is "moot."

Defendants are correct in stating that the usual rule in federal cases requires that an actual controversy must exist at all stages of the legal proceedings. The circumstances of this case, however, present a situation allowing the issuance of limited injunctive relief. Under the drug policy, a student who "withdraws," as did Balch, is precluded from attending school for the remainder of the semester. The court takes judicial notice that a "semester" is approximately four and one-half months. Thus, the normal semester is so short that the semester will expire before a final hearing on the merits of the propriety of any injunctive relief can be attained by any litigant, and certainly before the usual appellate process is complete. Further, four and one-half months is the *maximum* amount of time a student may be excluded from school, under the drug policy, for a first violation. If a student "withdraws" within the last month of a semester, the exclusion will be only during the few weeks prior to the end of the semester.

It stretches credulity to believe that the legal issues could even be "joined" by the parties, under Rule 12, Fed.R.Civ.P., prior to the end of the exclusion in cases where students are "withdrawn" in the latter stages of a semester. If the fact that Balch was no longer laboring under the "exclusion" from Arkadelphia High School by the time the decision was reached on the merits of her injunctive claim for relief makes her entire claim moot, cases of this nature will never survive through all appellate stages, and seldom even to trial.

It must be noted that a student is not merely searched and excluded from school for the semester under the policy, but loses *forever* all credit he or she may have acquired during that semester.

If policy sanctions are invoked during a student's senior year it is similarly highly unlikely that the student will continue to be a student at Arkadelphia High School at all stages of the judicial process. In the interests of self-preservation students will likely

transfer to other schools or obtain G.E.D. certificates of high school equivalency, as some parties in this case have done, rather than sit idly and re-enroll in the Arkadelphia system.

Although the court found that school officials were "justified in concluding that there were reasonable grounds to believe that plaintiff Balch had at least possessed marijuana at school" (Memo.Opin. at 45), Balch is entitled to have school officials enjoined from inclusion of the results of, or other materials pertaining to, the urinalysis test in her file for any period of time. Under the drug policy, the "withdrawal" and materials pertinent thereto remain in the student's file for three years. (See Defendants' Ex. 4).

■ Thus, although Balch is a former student, she is nonetheless entitled to limited injunctive relief. The school officials should be enjoined from inclusion of the results of the urinalysis test, or any materials pertaining to the urinalysis test, in her school records for any period of time.

■ Defendants' pre-trial submissions were phrased in terms of "standing." The court has concluded that Balch and Anable both have "standing" to contest the validity of the drug policy. As victims of an unconstitutional search, both former students clearly have standing to argue the legality of the searches in an action for declaratory and monetary relief. Additionally, as noted above, Balch has standing to seek limited injunctive relief.

Respective arguments with regard to the contingency which occurred when only plaintiff Balch, a former student, was found entitled to relief on the merits were neither solicited nor submitted previously. Having now considered the "mootness" arguments, the court concludes that the injunctive relief should be limited to the enjoining of school officials from inclusion of any materials pertaining to the urinalysis test of plaintiff Balch in her school records for any period of time.

All other relief, other than monetary damages, will be modified so as to be declaratory in nature. *See Pasadena City*

*Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

■ The declaratory relief shall be as follows:

The use of urinalysis testing of students for marijuana use by the Arkadelphia Public School System is unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution.

The use of any results of urinalysis testing of students for marijuana use in any school disciplinary proceedings of any nature, whether formal or informal, is unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution.

The inclusion of, or reference to, any materials or comments pertaining to any urinalysis testing of students for marijuana use in any student's files, temporary or permanent, for any period of time, is unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution.

■ In any event, the court does not perceive a vast practical difference between the issuance of injunctive or declaratory relief. Although defendants would not be subject to the contempt powers of this court if relief were solely declaratory in nature, this decision is *stare decisis* as to any subsequent similar action, and would have some preclusive effect on defendants, either by way of estoppel or by virtue of *res judicata.* In any event, any "good faith" defense as to similar issues would be negated.

It is clear from defendants' motion and brief that they desire to continue their experimentation with urine-testing. To the court's knowledge, no court has approved such tests. Because some injunctive relief is available to Balch, without question, and because there is a great public interest necessarily affected, the court finds no barrier to the issuance of the limited injunctive relief granted and the issuance of the declaratory relief set forth above.

## II.  Specificity of the Injunction

The injunctive language of this court's judgment of July 12, 1985, is as follows:

... defendants should be and hereby are permanently enjoined from the use of urinalysis testing of students as presently applied, and should be and hereby are further enjoined from the use of any results of urinalysis testing of students in any school disciplinary proceeding of any nature, whether formal or informal.

(Judgment at 2, ¶ 4).

Defendants argue that if any urine testing is to be prohibited, only the Emit immunoassay test should be the subject of any prohibition.  Although the court's discussion was primarily limited to the Emit immunoassay test because it was the test used, Dr. Harbison testified that of the urine tests available, i.e., the Emit immunoassay, gas chromatography, and gas chromatography-mass spectrometry, "none of these urine tests reflect the quantity of tetrahydrocannabinol present in the blood so as to support an opinion as to the pharmacological effects of the marijuana constituents on the user at the time the sample was taken." (Joint Stipulation of Testimony of Dr. Harbison, Plaintiffs' Ex. 8 at 5).  Thus, all urine testing is subject to the constitutional infirmities discussed in the memorandum opinion.

■ Because the urine tests available are unable to reveal the pharmacological effects of marijuana on the user or the approximate date of use, they cannot determine whether a student has possessed, used, or appeared at school under the influence of marijuana.  The utmost that the most precise of urine tests can reveal is that a student has ingested marijuana at some time in the preceding days or weeks.  Therefore, all of the urine tests are subject to the same infirmities, except that the Emit immunoassay is the least accurate in disclosing the actual presence of delta–9–tetrahydrocannibinol.

It is true that there are methods of administering the urine tests that would not be as flagrantly embarrassing to the students, but these are options school officials deliberately rejected in the past.  Further,

other than the embarrassment factor, the urine tests nonetheless constitute a "search" of body fluids, which, as yet, is held to be highly invasive.  *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

The modification set forth in part I should remove any "specificity" objections on the part of defendants.  The hypothetical situations and questions submitted by defendants will either be resolved by the modification of the relief granted or they will not.  If they are not, it is because such situations continue to be hypothetical and conjectural and do not, at this time, present an "actual case or controversy."  The court believes the injunctive and declaratory language is sufficiently "fastidiously drawn" to meet defendants' objections.  *See Schmidt v. Lessard*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974).  The language is sufficiently precise to provide adequate notice to school officials such that they can be required to continue to "experiment" with urinalysis testing only "at their peril."

### III.  The Good Faith Defenses

Defendants contend that they acted in good faith and are therefore immune from liability in their "personal" capacities.  *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).  The court agrees that defendants are entitled to a specific finding in this regard.

■ First, however, the court deems it necessary to discuss the distinction between "personal"-capacity liability and "official"-capacity liability.  Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).  Official-capacity suits are another way of pleading an action against an entity of which the official is an agent.  *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  An official capacity suit is in essence a suit against the entity.  *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).  An award against an official in his personal capacity

may be collected only from his personal assets, while an award in his official capacity must be collected from the government entity.

■ To establish personal liability in an action under 42 U.S.C. § 1983, it is sufficient to show that the official, acting under color of state law, caused the deprivation of a federal right. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In an official-capacity suit, however, it must be shown that the entity is a "moving force" behind the deprivation, *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), via a "policy or custom" thereof.

■ As to defenses, an official in a personal-capacity suit may assert personal immunity defenses, such as "good faith" qualified immunity, *Wood v. Strickland, supra,* or some defenses based upon absolute immunity, *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). These defenses are unavailable in official-capacity actions. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). The only immunity available in an official capacity suit is some form of sovereign immunity that the entity possesses by virtue of its status as a governmental entity. There is no longer any need to bring official-capacity suits against local government officials because local governmental entities may be sued directly. *Monell, supra; Memphis P.D. v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). For a recent discussion of the official/personal distinction in the context of fee awards under section 1988, *see Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

Defendants argue that they are exempt from personal liability because they acted in good faith. The good faith is assertedly exemplified by defendant Ford's investigation and study of the drug problem during which he received the "input" of the community, public officials and lawyers. Additionally, defendants contend, they were "writing on a clean slate" and implemented the policy only as a "tool of exoneration."

Initially the court wishes to reiterate that it was not impressed with the testimony of plaintiff Balch. As the court stated in its memorandum opinion: "If this court could decide the merits of plaintiff Balch's claim based upon whom the court believes, Balch would lose summarily with little discussion." However, the court cannot do so.

■ "Good faith" is an affirmative defense for the defendants to plead and prove. "Input" from the population favoring the drug policy cannot form the basis of a good faith defense, any more than the population may, by unanimous vote, abrogate constitutional protections. *See Lucas v. 44th General Assembly of Colorado,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), at 736, 84 S.Ct. at 1474: "One's right to life, liberty, and property ... and other fundamental rights may not be submitted to vote, ..."

Although there is little law directly on point, *Schmerber* has clearly required higher standards for the search of bodily fluids or body cavities than ordinary searches, as do the Arkansas Rules of Criminal Procedure. Defendants have cited *Doe v. Renfrow,* 631 F.2d 91 (7th Cir.1980), in their argument. In that case students were "sniffed" by drug dogs and, as a result, a 13–year-old girl was "strip-searched." The seventh circuit stated:

> It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency.... Simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law" (*citing Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000).

*Wood v. Strickland, supra,* accords immunity to school officials who act in good faith *and within the bounds of reason.* We suggest as strongly as possible that the conduct herein described

exceeded the "bounds of reason" by two and one-half country miles.

*Renfrow* at 92–93.

Requiring a student to disrobe from the waist down and urinate into a tube while being observed is little different from a nude search. Such a search is so inherently invasive as to be obviously suspect in the school setting.

Further, the evidence indicated that the three girls, Balch, Malone and Gleason, were told they *had* to submit, and that any "consent" was thereby "coerced." The court does not accept defendants' assertion that the testing was used as a mere "tool of exoneration." The public allegedly wanted, and the board approvingly adopted, a "tough" policy. The policy was indeed "toughly" enforced against the three girls who testified with respect to the urinalysis.

■ The court concludes that the "slate" was not entirely "clean" and that the defendants were sufficiently personally involved in the adoption and strict implementation of the policy to preclude the good faith defense urged, regardless of the desirability of eradicating drugs from our schools. A noble purpose will not exonerate one who acts without any apparent legal precedent in a search as inherently invasive as the urinalysis *as applied* in this case. All defendants were aware of possible constitutional problems. The instant case will not stand as a departure from settled precedent. There were obvious constitutional problems with the semi-nude body fluid searches involved, regardless of the purpose and regardless of any popularity of the policy.

The court concludes that the defendants are liable to plaintiff Balch, both in their official capacities and individual capacities. All defendants are therefore jointly and severally liable.

A separate modified judgment in accordance with the foregoing will be concurrently entered.