Clarence E. MUELLER, Appellant,

v.

REGENTS OF the UNIVERSITY OF MINNESOTA, Charles H. Casey, William B. Dosland, Willis K. Drake, Erwin L. Goldfine, Wally Hilke, David M. Lebedoff, Verne E. Long, Charles F. McGuiggan, Wenda W. Moore, David K. Roe, Mary T. Schertler, C. Peter McGrath, Frank B. Wilderson, Jr., Carl E. Nelson, Donald R. Zander, Bonita F. Sindelir, University of Minnesota, Senate Judicial Committee, Roger C. Park, Peter H. Robinson, Amos S. Deinard, Laird H. Barber, Martin Dworkin, Ellen C. Egan, William H. Flanigan, Ruth E. Franzen, Arnold H. Ismach, Wendell J. Josal, Douglas E. Lewis, Don G. Maceachern, Tim L. Mazzoni, Sue S. Meyers, Paul L. Murphy, Dale C. Dahl, Matthew V. Tirrell, Ray K. Sibul, Ed K. Stauffer, Eugenia R. Taylor, Cecil J. Waddington, Delane E. Welsch, Marla E. White, Leonard J. Greenberg, Kristin Hirt, Jennifer Sue Oatey, Jone Doe, Mary Roe, Appellees.

No. 87–5329.

United States Court of Appeals, Eighth Circuit.

Submitted May 5, 1988.
Decided Aug. 26, 1988.

John E. Vukelich, Apple Valley, Minn., for appellant.

William P. Donohue, Minneapolis, Minn. for appellees.

Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Professor Clarence Mueller appeals from the district court's[1] entry of summary

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

judgment against him in his suit challenging his termination as a tenured associate professor and director of the Office of Recreational Sports at the University of Minnesota. For reversal, Mueller contends that there are genuine issues of material fact regarding his due process, equal protection, breach of contract, and interference with contract claims. We affirm the judgment of the district court.

In 1952, the University of Minnesota hired Mueller as a full-time instructor in the Department of Physical Education and Athletics. In 1957, Mueller was promoted to an assistant professor, and in 1960 he achieved tenure. From 1954 until 1963, Mueller headed the men's intramural program and after that, he served exclusively as the Chairman of the Intramural Sports Program for Men and as Director of the Department of Recreational Sports in the Office of Student Affairs.

The University audited his program in December, 1982 in response to allegations that Mueller had misused the University's personnel, name and resources. The University's Audit Department prepared a report, which listed the persons interviewed, summarized their testimony, provided exhibits, and set forth a series of findings confirming the allegations. Mueller's former secretaries testified that they spent a substantial amount of their time working on Mueller's personal businesses while employed and paid by the University. Kris Hirt, Mueller's secretary from June 1977 to October 1978 testified that she spent about 95% of her time working for Disco World, one of Mueller's companies, while being paid as a University secretary. She typed contracts and correspondence, wrote checks, arranged shows, did the bookkeeping and made trade calls. Hirt's testimony was corroborated by other clerical department employees. Sandra Wenholz, Mueller's secretary from February 1979 to October 1983, reported that she did a substantial amount of Mueller's personal business for PMI, another Mueller company on University time. She arranged a seminar sponsored by PMI devoted to "reboundology." [2] Proceeds from the seminar went to PMI, although Wenholz was paid by the University for two days of regular time and fourteen hours of overtime for the work devoted to the seminar.

The report also detailed incidents of Mueller's misuse of the University name. His business card for one of his businesses, "Seminars, Etc.," contained the University logo. He also conducted seminars at the University for PMI devoted to selling "rebounders," and used University letterhead when seeking a business loan.

Finally, the report provided a myriad of examples of Mueller's misuse of University resources. Mueller billed both the University of Minnesota and the University of Michigan for the same travel expenses, and charged radio advertisements for Disco World, one of his private businesses, to the University. He used University funds to pay for express mailing with relation to paid consulting work which he later billed to a client and did not reimburse the University. He charged numerous personal telephone calls to the University. The Minnesota Masonic Home invited Professor Mueller, as a University professor, to give a talk on wellness, but his talk ended up being a sales pitch for his "rebounders." He allowed Ishwar Puri to conduct palm readings in his office. The readings, for which a fee was charged, were advertised in the *Minnesota Daily*, scheduled by University personnel, and conducted during regular work hours.

The Audit Department submitted its report to Dr. Wilderson, Vice President in charge of student affairs, and Professor Mueller, who responded in writing. After reviewing the report and Mueller's response, Dr. Wilderson sent a letter to Mueller initiating removal proceedings under the University of Minnesota's Regulations Concerning Faculty Tenure (Tenure Code). In his letter, Dr. Wilderson referred to the

---

**2.** From the best we can glean from the record and oral argument, "reboundology" is a thera- putic methodology involving the use of small trampolines.

Audit Report and stated that Mueller's misuse of the University's personnel, name and resources was such as to "seriously interfere with your capacity completely to perform your duties in the office of Recreational Sports and your usefulness to the University."

Mueller requested a hearing before the Senate Judicial Committee. This group of faculty members, appointed by the University Faculty Senate to hear faculty complaints under the Tenure Code, consisted of tenured professors from outside Mueller's department. Before the hearing, Mueller was represented by counsel and allowed extensive discovery, including witness interviews, exchanges of interrogatories, requests for admission, and document production. On November 10, 1983, a prehearing conference was held and the parties exchanged issue, witness, and exhibit lists.

The panel heard testimony from 33 witnesses and received 200 exhibits during approximately 116 hours of proceedings. Mueller's counsel presented and cross-examined witnesses, introduced documentary evidence, and made both oral and written arguments on Mueller's behalf. Mueller also testified at the hearing. On June 11, 1984, the Panel issued its Final Findings and Recommendations, in which it discussed the issues and evidence and recommended that Mueller be terminated for cause under the Tenure Code. The Panel found that "the charges of misuse of University personnel, name and resources were sustained by clear and convincing evidence." The Panel concluded that "Professor Mueller's character, as exemplified by his conduct over the years, would seriously interfere with his usefulness to the University, whether he acts as an administrator or as a faculty member."

The President of the University adopted the Panel's Findings and Recommendation after reviewing them, as well as memoranda submitted by both Mueller and the University. Professor Mueller then appealed to the Board of Regents, who, after a hearing, approved the President's recommendation.

Mueller filed suit in district court against the Board of Regents, the Senate Judicial Committee and 43 individuals, seeking reinstatement, backpay and benefits, and compensatory and punitive damages. Mueller alleged violations of his constitutional rights and also asserted claims based on breach of contract, interference with contract, negligent and intentional infliction of emotional distress, and libel, slander and defamation. The district court granted the University's motion for summary judgment.

In reviewing a district court's decision to grant a motion for summary judgment, we apply the same standard as the district court. *Mandel v. United States*, 719 F.2d 963, 965 (8th Cir.1983). Summary judgment should be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We must view the facts in the light most favorable to Mueller, giving him the benefit of all inferences to be drawn therefrom. *Mandel*, 719 F.2d at 965.

I.

Mueller first contends that he was not accorded procedural due process in connection with his dismissal. We have outlined the due process requirements of notice and hearing in *Agarwal v. Regents of the University of Minn.*, 788 F.2d 504, 508 (8th Cir.1986) (per curiam).

■ Mueller argues that he did not receive adequate notice of his termination as a tenured faculty member because the notice he received made no distinction between his termination as a tenured faculty member and his termination as an administrator. Mueller points to the Tenure Code which states: "[t]he removal of any person from an administrative position does not impair his rights to in and in his faculty rank."

We reject this argument. The notice Mueller received enumerated the charges against him, the misuse of the University personnel, name and resources, and stated that these charges seriously interfered with his duties in the office of recreational

sports and with his "usefulness to the University." The nature of the charges and the later reference to his usefulness sufficiently informed Mueller that his administration position as well as his employment with the University was in issue. *Agarwal,* 788 F.2d at 508; *King v. University of Minn.,* 774 F.2d 224, 228 (8th Cir. 1985).

■ Mueller also argues that Wilderson's notice letter was inadequate because it failed to provide him with the names of his accusers or the reasons for his termination and that he did not receive this information until one month before his hearing. He offers this argument particularly with regard to his termination as an administrator. Some eleven months before the hearing, however, Mueller received the Audit Report, which provided him with notice of the names of those who made allegations against him and the specific nature and the factual basis for the charges. Wilderson's notice letter specifically referred to the Audit Report. Mueller does not identify any witnesses not named in the report who later testified at his hearing, nor could we locate any. We reject Mueller's contention that the notice letter must restate the details of the charges and identify his accusers. *See Agarwal,* 788 F.2d at 508.

■ Next, Mueller claims that his procedural due process rights were violated because one of his witnesses failed to testify because of alleged intimidation by the University and that the Senate Panel was biased in this regard because it failed to invoke procedures it had previously outlined to deal with witness intimidation. After careful consideration, the district court concluded that although there was a dispute of fact as to whether the witness was intimidated, summary judgement was appropriate because the failure of the witness to testify did not affect the outcome of the proceedings. We agree. The witness' affidavit admits that he did not know "whether Professor Mueller was ever guilty or innocent of whatever he was being charged with." With regard to the panel's possible bias, the Panel appointed a Hamline University law professor to conduct an investigation, listened to testimony from witnesses about the incident, and heard argument from counsel. The Panel contacted the witness and asked him to testify. When he refused, they allowed his tape-recorded interview to be played into the record. There is no evidence that the Panel failed to follow its procedure with respect to witness intimidation. Moreover, the Faculty Panel was made up of professors from departments other than Mueller's and Mueller was given an opportunity to challenge any of the panel members for bias. We conclude that no genuine issue of fact exists as to whether Mueller received a hearing before an impartial tribunal.

■ Mueller also claims that the Senate Panel was biased because it granted immunity to Hirt, a key witness against him, for her alleged misconduct. This argument is without merit. The Panel recognized Hirt's possible bias, and gave credit only to essential features of her testimony corroborated by other witnesses.

There is no genuine fact issue as to whether Mueller received the process he was due. *Agarwal,* 788 F.2d at 508; *King,* 774 F.2d at 228. Therefore, the district court correctly granted summary judgment to the University on this issue.

## II.

■ Mueller next contends that there is insufficient evidence to support the University's decision to terminate him from his tenured faculty position and therefore he was denied substantive due process. He points to the facts that neither party offered direct evidence on his teaching ability, and that under the University regulations a tenured faculty member who is dismissed as an administrator is normally returned to faculty rank.

It is not for the district court or this court to determine *de novo* whether we would terminate Mueller based on the evidence presented during the termination hearings. *King,* 774 F.2d at 227. Our role is limited to examining the records of the proceedings to determine whether there

was substantial evidence to support the University's determination. *Wood v. Strickland*, 420 U.S. 308, 325–26, 95 S.Ct. 992, 1002–03, 43 L.Ed.2d 214 (1975).

The Panel concluded that Professor Mueller's character, as exemplified by his conduct over the years, would seriously interfere with his usefulness to the University, whether he acted as an administrator or as a faculty member. We will not recount the substantial evidence concerning Mueller's misuse of the University name, personnel and resources. *See supra* p. 557. The evidence presented as to Mueller's misuse of his position at the University and his misuse of the University resources was overwhelming and would affect his capacity as an administrator or as a teacher, irrespective of what his teaching ability, unutilized for years, might be. The district court did not err in granting summary judgment for the University on this issue. We therefore conclude the district court correctly granted summary judgment for the University on this issue.

### III.

Mueller also urges that the district court erred in rejecting his equal protection claim. Mueller urges that the University treated him differently than other tenured faculty or administrators who were permitted to freely use the University name, resources and personnel. Among other examples, Mueller points to University basketball coaches who use the University name in advertising basketball camps. However, Mueller's isolated examples are not comparable to his prolonged conduct, and this evidence does not create a genuine issue of material fact that the state treated Mueller differently than it did others similarly situated. *See Craft v. Wipf,* 836 F.2d 412, 418 (8th Cir.1987).

### IV.

Mueller further argues that the district court erred in dismissing his state law claims, particularly his breach of contract claim. He maintains that the Regents' Policy on Outside Consulting, Service Activities and Other Outside Work is incorporated into his contract and that the University breached this by failing to comply with the procedural aspects of that policy. *See Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983). We agree with the district court that there is no genuine issue of fact as to whether the University breached its contract. The Tenure Code, not the Regents' Policy on Outside Consulting, sets forth the standards and procedures for termination of Mueller's contract. Mueller's termination was justified under the Tenure Code and the termination procedures were in compliance with the Code. The district court was therefore correct in dismissing Mueller's breach of contract claim. *See Goodkind v. University of Minn.,* 417 N.W.2d 636, 638–40 (Minn. 1988).

Finally, Mueller claims that the district court erred in dismissing his intentional interference with contract claims against all of the individuals involved in his termination process, including decisionmakers, witnesses, and lawyers. We agree with the district court's conclusion that because the University was justified in terminating Mueller's contract, there can be no argument that an individual involved in the termination proceedings tortiously interfered with the contract. *Cf. Decker–Ruhl Ford v. Ford Motor Credit,* 523 F.2d 833, 836 (8th Cir.1975) (applying Missouri law).

We affirm the judgment of the district court.