Maria T. TORRES
HERNANDEZ, Plaintiff,

v.

Pedro A. PADILLA, etc., Defendants.

Civ. No. 85–1699(PG).

United States District Court,
D. Puerto Rico.

April 10, 1986.

Miguel Pagán, Hato Rey, P.R., for plaintiff.

Edgardo Colón Arrarás, Federal Litigation Dept., Dept. of Justice, San Juan, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMINEZ, Chief Judge.

This is another case in the long tradition of political discrimination of municipal government employees caused by politicians against employees appointed by a previous political administration. This practice cannot be tolerated by the judicial system.

The complaint in the case at bar was filed on August 14, 1985. Initially a temporary restraining order and a preliminary injunctive relief was requested but became moot when plaintiff ceased working for defendant. The action remained as an ordinary civil case brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, where plaintiff alleged violation of her constitutional rights to freedom of belief and association.

On September 9, 1985, a motion to dismiss was filed by defendants. After several responsive motions were filed, the motion to dismiss was denied on October 29, 1985. Through an opinion and order issued on January 24, 1986, the action filed by plaintiff's spouse, Mauricio Rodriguez Castrillón, and by the legal partnership formed by both spouses was dismissed for lack of standing to sue under 42 U.S.C.A. § 1983.

This Court has jurisdiction over the subject matter of the complaint under 28 U.S.C. §§ 1331 and 1343(3) and (4).

*Findings of Fact*

Plaintiff, Maria T. Torres Hernández, is a 56 year-old lady who has been married for 36 years to Mr. Mauricio Castrillón. She has a son who lives in New York and three daughters.

Plaintiff began to work for the Municipal Government of Trujillo Alto in 1977 during the former New Progressive Party (NPP) administration of said municipal government. Plaintiff was initially appointed as Secretary to the Municipal Assembly. Thereafter, she became Office Clerk with the Municipal Government and in 1979 was appointed Personnel Officer by former NPP Mayor José Rivera Nia. The position of Personnel Officer is a permanent or career position. After plaintiff approved the probationary period in said position she became a permanent, career or tenure employee of said municipal government. The Municipal Government of Trujillo Alto has approximately 350 employees.

Before plaintiff began to work for the Municipal Government of Trujillo Alto she worked in the Central Offices of the NPP in San Juan as a Secretary under the supervision of the NPP General Secretary, Mr. Rafael Rodriguez Aguayo.

Plaintiff has been referred to as a very good employee and, specifically, actual Popular Democratic Party (PDP) Mayor, defendant Mr. Pedro Padilla, described her as a "magnificent" employee. In the Municipal Government of Trujillo Alto the Personnel Officer is for all practical purposes the Supervisor and Director of the Personnel Office. The duties performed in said office mainly concern keeping and maintaining the employees' personnel records; the preparation of the payrolls; the transmittal or processing of appointments; the preparation of the reports to be submitted to the Social Security Administration, the State Employees Retirement Fund, and the medical plans, the personnel assistance records and other records related to disciplinary actions against municipal employees. The immediate supervisor of the Personnel Officer is the Mayor.

As a result of the elections of November 1980, the PDP candidate for mayor, defendant Pedro Padilla, took office as Mayor of the Municipality of Trujillo Alto. The Municipal Assembly was won in the same elections by the NPP. This brought to the Municipal Government of Trujillo Alto a shared government in which the Executive Power (the Mayor) was controlled by the PDP and the Legislative Power (the Municipal Assembly) was controlled by the NPP. The political relationship between the Mayor and the Assembly was very tense. Defendant Mayor is also a member of the State Board of Governors of the PDP.

Since defendant Mayor Pedro Padilla took office he embarked on a continuous and systematic political harassment conduct against plaintiff Maria Teresa Torres Hernández. The witnesses' statements and the documentary evidence on record establishes that plaintiff suffered the following unjustified and illegal political harassment:

1. On March 1981 the defendant questioned plaintiff about her having lunch in the Office of the Municipal Assembly with fellow workers Ana Luz González, Cecilia Príncipe, Hilda Vizcarrondo and Maria del Carmen Valentín, all of whom are affiliated with the NPP, and prohibited her from participating in groups or meetings of any kind with said employees. Plaintiff's uncontroverted testimony established that it was common for groups of employees to gather for lunch. The Mayor did not question other groups of employees who gathered in such a fashion.

2. On July 1981 the Mayor prohibited plaintiff from going to the NPP Municipal Assembly and chided her for going there. The reason for plaintiff's visit was an official one since the photocopying machine of the Municipal Government was out of order and she needed to photocopy official documents. Furthermore, she needed to speak to the Secretary of the Assembly, Attorney Radamés Collazo, about the assistance records of the employees. The Mayor stressed to plaintiff the prohibition to visit the Assembly and insisted that he

should be informed of any documents requested by the Assembly and again warned her.

3. The Personnel Office was reduced in 1981 from five employees to three employees without taking into consideration the opinion or recommendation of plaintiff as supervisor of said office. Two of the employees were dismissed and the third was transferred. The three of them are NPP affiliates. No additional personnel was brought to substitute the aforementioned employees. The two employees dismissed were described as good employees and no explanation was given by the Mayor for their dismissals or removals.

4. On two occasions, April 1981 and February 1982, the Mayor's Secretary questioned plaintiff about her assistance to meetings of the NPP. The Mayor's secretary told plaintiff also not to go to said meetings because she could be seen by municipal employees. After the second questioning by the Mayor's secretary, the plaintiff, in order to be left at peace from this harassment, addressed a letter to the NPP President in Trujillo Alto, former NPP Mayor José Rivera Nia, through which she resigned from any further participation in political affairs. Plaintiff gave the letter to the Mayor's secretary and requested her to send the same. The Mayor's secretary sent the letter herself.

5. On March 1982 the defendant Mayor again questioned plaintiff for having lunch with co-employees at the Municipal Assembly Office and again prohibited her to go.

6. A very significant incident occurred when the Mayor found out that Mr. Martinez, Sergeant of Arms of the Municipal Assembly, told a PDP leader that plaintiff was a NPP affiliate and that the defendant Mayor was a sucker for believing that plaintiff was a PDP affiliate. The Mayor angrily called plaintiff to his office. After telling her the whole incident he angrily told her that he was tired of it. Defendant also threatened plaintiff by telling her that one of these days he would be angry at her and would fire her. Then he challenged or defied plaintiff to go to Attorney Radamés

Collazo, Secretary of the Assembly, to ask for advice. Defendant Mayor also told plaintiff that she made him sick and also warned her again to do everything right because otherwise she would be in great trouble and nobody would stop him. He finished the incident commanding her to go to her office. During the incident the Mayor used expressions such as "pendejo" and "harto" (fed up). The word "pendejo" is considered in Puerto Rico obscene language, offensive and of bad taste and bad manners, specially when used in front of a lady. The tone of voice used by the Mayor during the incident was offensive. As a result of his awareness of plaintiff's political affiliation, a drastic change occurred in defendant's behavior towards plaintiff. He became hostile, excessively intolerant and persecutorial towards her.

7. The record clearly shows that on July 1982 defendant wanted to create a position of Personnel Director in the budget but was not successful. After the Municipal Assembly denied said approval, he again called plaintiff to his office and threatened and warned her again in relation to her job security.

8. In his efforts to try to deprive plaintiff of her authority and supervisory duties in the Personnel Office, the defendant contracted on February 1983 an attorney named Carmen Fernández, who had been his co-employee while both worked for the Housing Department of the Commonwealth of Puerto Rico in the Housing and Urban Renewal Corporation (CRUV).

9. Attorney Carmen Fernández assumed the role of an advisor to the Mayor in personnel matters. (Plaintiff's Exhibit 19). The record shows that in reality it turned out to be for all practical purposes that Attorney Fernández became the Director of the Personnel Office, depriving plaintiff of all her authority and supervisory powers in said office.

There is abundant evidence in the record that shows that plaintiff's functions, which included, among others, the supervision and assignment of duties to employees, updating of employees' records, preparation

of employees' attendance records, were performed by Attorney Carmen Fernández.

10. Another employee of the Personnel Division, Hilda Vizcarrondo, who was also an NPP affiliate, was transferred by the defendant to the Health Center.

11. The Mayor ordered plaintiff to move her desk to another area of the Personnel Office when Attorney Carmen Fernández arrived to work in the Municipal Government of Trujillo Alto.

12. Attorney Carmen Fernández usurped plaintiff of her office and of her desk. Plaintiff was forced to work in a corner of another office where she had no alternative but to put the office supplies in a shoebox. Plaintiff was prohibited from attending any visitors. Attorney Fernández also humiliated plaintiff by forcing her to pack approximately four hundred (400) employee records and moving them to a warehouse outside the Personnel Office. When plaintiff was testifying as to this specific incident she burst into tears, which forced the Court to recess for more than half an hour until the plaintiff regained her composture and continued with her testimony. Plaintiff was put on said packing activity for three weeks and she had to forego her executive clothing and don labor clothes such as jeans.

13. Plaintiff complained about said state of affairs to defendant Mayor and tried to have him clarify to her the position and authority of Attorney Carmen Fernández. Defendant scolded plaintiff for being, according to him, disrespectful to Attorney Fernández.

14. Luz C. Rivera is an employee of the Personnel Office in charge of preparing the payroll of the municipal employees. During April 1983 she was granted leave for seven days. The plaintiff was advised that the leave of Mrs. Rivera was only for three days. The evidence showed that the four additional days of leave taken by Luz C. Rivera came about as a result of a suggestion from Attorney Carmen Fernández. The extra days of leave taken around Holy Week time, created an emergency situation in relation to the preparation of the employ-

ees' payroll, to the extent that the municipal employees threatened to carry out a labor stoppage until they were paid. This situation forced plaintiff to request assistance from other municipal divisions in order to process the payroll. Later on, when plaintiff questioned Mrs. Rivera about the four additional days, Attorney Fernández scolded plaintiff and ordered her to go to her desk. Attorney Fernández told plaintiff that the decision regarding the four additional days was made by the Mayor.

15. On May 18, 1983, defendant arbitrarily cancelled plaintiff's vacations alleging sickness of co-employee Luz C. Rivera. Said vacations had been approved two months before Mrs. Rivera, a PDP affiliate, was granted indefinite leave. (Plaintiff's Exhibits 1 and 2). Plaintiff's vacations were supposed to begin on May 20, 1983. She and her husband had bought airline tickets and made plans for a trip to New York to visit their son. Plaintiff began to cry and had a nervous breakdown when she was informed of said arbitrary cancellation. Plaintiff went to the doctor that same afternoon and was attended in the Health Center of the Municipal Government of Trujillo Alto by Dr. Quiñones, who found her with high blood pressure and stress and ordered her rest. As a medication he prescribed Valium.

16. When plaintiff met with defendant on Friday, May 20, 1983, he gave little credibility to the medical certificate of Dr. Quiñones.

17. Although plaintiff worked on May 18 and 19, 1983, defendant put Gladys García Ramírez, plaintiff's subordinate, in charge of the Personnel Office on May 18, 1983. On Friday, May 20, 1983, plaintiff could not continue working as a result of her emotional condition and reported to the State Insurance Fund.

18. Luz C. Rivera, who allegedly was seriously sick and who was granted indefinite leave, reported back to work on the next working day. She was not hospitalized a single day.

19. The emotional condition which affected plaintiff since the arbitrary cancellation of her vacations on May 18, 1983, kept plaintiff absent from work for eight months. She was under psychiatric treatment in the Puerto Rico State Insurance Fund.

20. Even though the State Insurance Fund diagnosed plaintiff's emotional condition as anxiety depression—job related (Plaintiff's Exhibit 5) and that Dr. Elí Rojas, a psychiatrist, recommended a change of work place, defendant relocated plaintiff to a warehouse of the Health Center. Said warehouse was completely closed and with poor ventilation. Plaintiff's duties or functions were demoted to those of a guardian or warehouse woman. The only other co-worker working at the warehouse at that time spent most of his time out in the field.

21. Defendant Mayor Padilla scared plaintiff while she was in the City Hall looking for an income certification.

22. Notwithstanding the aforementioned medical recommendation of Dr. Elí Rojas, issued on January 16, 1984 (Plaintiff's Exhibit 6), which was delivered to the defendant by the plaintiff, the defendant summarily transferred plaintiff to the Personnel Office on March 1, 1984, to be effective the next day (Plaintiff's Exhibit 3). This transfer occurred because the Municipal Assembly had denied defendant's request for the creation of the Personnel Director position.

23. On March 2, 1984, the first day that plaintiff returned to the Personnel Office, the Mayor, his Finance Director, Carmen García, and the Finance Consultant of the Mayor, Félix Gómez, strongly questioned plaintiff in relation to a claim by the Retirement Fund of the Government of Puerto Rico against the Mayor for $1,000.00. The claim occurred because the Mayor's monthly salary was reduced for retirement purposes 5.5% instead of 7%. It was the defendant who had previously requested plaintiff to help him reduce his monthly deductions since he was in a bad economic situation. The psychological pressure against plaintiff on said meeting was very high.

24. The attitude of co-employees with plaintiff after she returned to the Personnel Office from March 2 to March 8, 1984, was very cold, and as a result of all the psychological pressure exercised upon her, plaintiff was not able to return to her work after March 8, 1984.

The psychiatrists of the Puerto Rico State Insurance Fund, Drs. Elí Rojas and Héctor Sampayo, concluded in their final diagnosis that plaintiff suffered from anxiety disorder with depressive traits which prevented her from working. (Plaintiff's Exhibits 4, 5, 7, 8, 9, 10, 21 and 22).

On January 15, 1985, the Puerto Rico State Insurance Fund issued its final decision regarding plaintiff, concluding that her psychiatric condition was job related. (Plaintiff's Exhibit 11). On February 27, 1985, the State Insurance Fund granted plaintiff monetary compensation in conformity with this decision. (Plaintiff's Exhibit 12).

On October 21, 1985, the Puerto Rico Retirement Administration Fund, through Dr. Ramón Piñero Rivera, found that plaintiff was incapacitated as a result of her mental condition. (Plaintiff's Exhibits 16, 17 and 18). Plaintiff also filed a petition before the Social Security Administration and was evaluated on December 14, 1985, by Dr. Pilar García Resusta, psychiatrist (Plaintiff's Exhibit 20). The diagnosis of Dr. Pilar García Resusta was severe depressive disorder with anxiety traits.

Dr. Elí S. Rojas' expert testimony offered the Court a clear and very accurate picture of plaintiff's sickness. When asked how does his diagnosis compare with the diagnosis of doctors Ramón Piñero and Pilar García Resusta, he replied that they were more or less the same. Dr. Rojas explained that the specific trait which the psychiatrist can find to be predominant in persons with plaintiff's diagnosis depends on which trait is stronger at the particular moment of the evaluation. Dr. Rojas found that plaintiff's emotional condition was caused by her difficulties at work.

Dr. Rojas recommended further psychiatric treatment for approximately two years on a weekly basis. Plaintiff's last visit to Dr. Rojas was on January 2, 1986. The approximate cost of each visit varies from $30.00 to $50.00.

Plaintiff was initially prescribed Estrafón, which was later changed to Valium. Dr. Rojas expressed that the prescribed medications should be taken for approximately six more months at the most. The medications should be taken once or twice a day and the approximate daily cost of them is of ninety cents (90¢) to one dollar ($1.00).

The prognosis as expressed by Dr. Rojas of plaintiff's condition is "Reserved" and "Guarded", which means that it is unpredictable. Dr. Rojas expressed, however, that plaintiff may work in the private enterprise but not in activities related with her previous activities as Personnel Officer. Dr. Rojas recommended that plaintiff should be referred to Vocational Rehabilitation to receive re-training in other areas.

The money that she will receive from the Retirement Fund will complicate her emotional condition and recovery. According to Dr. Rojas, this secondary profit ($350.00 monthly pension from the Retirement Fund) will reinforce her unconscious derogatory or insufficiency feelings about herself and she will be auto visualized as incapacitated and unuseful.

When questioned whether plaintiff could malinger the facts that she presented, Dr. Rojas expressed that not in her case since he had been treating her for many months and would have noticed any malingering by now.

When answering the attorneys for the defendant in relation to what usually triggers a dysthymic disorder (which is the modern term for a depression with anxiety traits), Dr. Rojas enumerated first among the most frequent cases the loss of a job. The psychiatrist also mentioned that the cause for plaintiff's dysthymic disorder was "the difficulties she was having at work".

Attorneys for the defendants tried to establish that two previous physical accidents of plaintiff in which a 5% incapacity was granted in both of them may have had some relation with the dysthymic disorder. The testimony of Dr. Rojas and the testimony of plaintiff convinced the Court that these did not have any relation to the plaintiff's emotional condition, or as Dr. Rojas named it, depression with anxiety traits. The previous small accidents refer to a fall from a chair while plaintiff was working for the NPP before 1977 and another fall in the City Hall while plaintiff was working with the former NPP Mayor, José Rivera Nía. Plaintiff expressed, in relation to how did she feel after receiving treatment for said falls, that she felt recovered. There is nothing in the record to which an inference can be made of any complaint, absences from work or treatment to the plaintiff due to back aches or any other muscular pains while she worked for former NPP Mayor or for the defendant.

The testimony of Luz Celenia Rivera and Gladys García Ramírez are classic examples of public employees who are grateful to their boss for the promotions they have received. Luz C. Rivera was the Personnel Officer when the former NPP Mayor took office in 1977. After Luz C. Rivera had some health problems, former NPP Mayor appointed plaintiff for the position occupied previously by Luz C. Rivera. The defendant reclassified Mrs. Rivera's position and at the present she is Executive Officer II. While testifying, she did not remember the dates she was absent during May 1983 and when she reported back to work. According to her, she was absent eight (8) labor days while witness Carmen García Ramírez remembers Luz C. Rivera returned to work on May 23, 1983, and was absent only five (5) days. Luz C. Rivera has been working in the Municipal Government of Trujillo Alto for more than 15 years. At the present she is a PDP affiliate, but she was initially an NPP affiliate. Luz C. Rivera portrayed the work of attorney Carmen Fernández mainly in relation to the up-dating of the employees personnel records. Said function or duty is not to be expected

from an advisor who is a lawyer. Said duty is one of the main duties of a Personnel Director or Officer. Mrs. Luz C. Rivera testified on a non-convincing tone and her alleged non-checking of the personnel records before she came to Court is simply unbelievable.

Carmen García Ramírez testified that she was appointed as a Janitor in 1979 on a Federal Program named C.E.T.A. by the former NPP Mayor. Later, in 1980, she became an Office Clerk by contract on an irregular status. Since defendant took office many personnel classified as irregular and on a contract status, such as the one she had, were dismissed or removed, nevertheless, she was retained by defendant and chosen to occupy one of the carrer positions created in 1982. Said position was not approved by the NPP Municipal Assembly from 1981 to 1984. In July 1985 Mrs. Carmen García was appointed to a regular or career position in the Personnel Office by defendant Mayor and her six-month probationary period was approved by the defendant Mayor after the complaint in the case at bar was filed (on August 14, 1985). As recently as January 1986 Mrs. García Ramírez expressed that she is an NPP affiliate but also admitted that she is very grateful to the defendant Mayor. Mrs. Carmen García Ramírez came dressed to the Court in the colors of the PDP on a clear and obvious demonstration of her gratefulness to defendant Mayor.

Mrs. García also testified that she considered Attorney Fernández a co-employee of the Personnel Office. She admitted that she did not know any specific duties or assignments ordered by Attorney Fernández to plaintiff. She also testified that Attorney Fernández had a private office, separate from the Personnel Area, while Luz C. Rivera's testimony pretended to locate Attorney Carmen Fernández as working in one of the five desks of the Personnel Area. Mrs. García could not recollect any other lawyer at any other time under contract with the Municipal Government doing similar jobs or duties as the ones that Attorney Fernández performed.

Defendant Mayor Pedro Padilla testified that he located Attorney Fernández in the Personnel Area. He also testified that plaintiff was resentful of the orders given to her by Attorney Fernández. It strikes this Court as odd that a Mayor's Aide or Advisor be located in the Personnel Office and be empowered to issue or give orders to employees working in said Division. The testimony offered by the Mayor was completely evasive and extremely verbose.

All the acts performed by defendant Pedro Padilla were in his capacity as Mayor of Trujillo Alto, Puerto Rico. He expressed that under said capacity he formulates the public policy of the Municipality.

■ Plaintiff was aware that the Personnel Regulations of the Municipality were not in harmony with those issued as guidelines by the Central Office of Personnel Administration for the Commonwealth Government (OCAP). Conscious of this discrepancy, plaintiff took it upon herself to visit OCAP in search of orientation. She was advised at OCAP that technical assistance could be provided to the Municipality at a minimum cost. OCAP would embark on a study of the Personnel Regulations of the Municipality and render a report containing concrete recommendations in order to bring said regulations into harmony with those of OCAP. Plaintiff informed defendant of her endeavors in this matter. The Court must then conclude that there was no real necessity on the part of the Mayor to have under contract an in-house Personnel Advisor since there exists a specialized state agency (OCAP) that is precisely empowered to provide such service. His motives in the factual context of this case as far as the hiring of Attorney Fernández are suspect.

■ On the other hand, the alleged intentions of defendant to improve the Personnel Area also lack credibility. The systematic reduction in force of said office by way of dismissals, removals and transfers of the NPP employees evinces a systematic political strategy of the Mayor to control the existing office. As an additional factor Mayor Padilla substituted plaintiff in her

position. The political strategy was to leave the Personnel Office with Luz Celenia Rivera, who is a PDP, Carmen García Ramírez, who is very grateful to the defendant for her promotion and job security, and with a permanent emotional disabled or incapacitated María Teresa Torres Hernández (the plaintiff), all of them supervised by Attorney Fernández.

As a consequence of plaintiff's emotional sickness, plaintiff was not able to work from May 20, 1983, to January 19, 1984, and has not been able to work since March 8, 1984, to the present. During said period of time she has not received her regular monthly salary. Plaintiff's gross salary was $650.00, and with across-the-board increases her salary has been raised to $825.00 at the present.

Plaintiff was forced to pay directly into her medical plan. Plaintiff's economic situation, as well as her credit, suffered. She received several letters from the creditors pointing to her arrears in the payment of her debts, specially, related to the mortgage payment on her home. She and her husband were forced to take a loan from their son-in-law in order to be able to update their home mortgage monthly payments. She was not able to help her husband meet their economic obligations (Plaintiff's Exhibits 13, 14 and 15).

The testimony of plaintiff's husband, Mauricio Rodríguez Castrillón, gave the Court a precise but sad image of the negative impact that the defendant's political harassment and persecution had against the mental and private life of plaintiff and her husband. Plaintiff has suffered stress, anxiety, depression, humiliation, fears, discomfort, deceptions and has cried a lot. As a consequence of the political harassment of the defendant against her, she had become a disabled or incapacitated person with a permanent emotional damage and an affected working and professional reputation. She has been forced to retire after being affected permanently in her emotional system at the age of 56 years old.

Her present and future economic situation has turned somber. Her social life has become almost nonexistent, and the buying of clothes and expenses in travel have been cut almost completely. Her husband also testified that as a woman and as a human being plaintiff has changed a lot. She is no longer the happy woman she used to be. She does not go out of her home, does not take care of her personal appearance and most of the time she is crying and sad. Their conjugal life has been extremely affected.

■ This Court concludes as a matter of fact that the political harassment and persecution suffered by plaintiff since 1981 until 1984 has caused her permanent disability and her incapacity to work. The Court concludes that plaintiff's emotional condition was caused by defendant's political harassment and persecution.

Defendant's behavior involved a reckless or callous indifference to the plaintiff's protected rights. Defendant used against plaintiff every conceivable psychological pressure and personnel artifice to harass and persecute her. The systematic political harassment used against plaintiff deserves our strongest repudiation. Defendant's conduct is the anthitesis of the political tolerance that is expected from a Mayor in our system of law and democracy.

Mayor Pedro Padilla's testimony unsuccessfully attempted to explain the arbitrary cancellation of the plaintiff's previous approved vacations and the arbitrary return of plaintiff on March 1, 1984, to the Personnel Office from the Municipal Health Center warehouse. He did not deny any of the other specific facts testified by plaintiff, the psychiatrists and her husband, which clearly established the political harassment and persecution to which she was submitted by the Mayor.

### Conclusions of Law

■ To prevail in an action brought under section 1983, two essential elements must be proven: (1) that the conduct complained of was committed by a person or persons acting under color of state law; and (2) that this conduct deprived a person

or persons of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parrat v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981).

Municipalities may be sued under section 1983 when the conduct alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Local governments may also be sued for alleged constitutional deprivations caused by governmental custom. *Id.*, at 690–1, 98 S.Ct. at 2035–36. We, however, find that the Municipality in this case is not liable to plaintiff for damages. The political harassment suffered by plaintiff was not the result of a policy, ordinance, regulation or decision officially adopted by the Municipality. The political harassment was the result of the Mayor's personal prejudice against this particular plaintiff. There is no evidence of similar conduct against other employees because of their political affiliations. Plaintiff alleged that the Mayor dismissed other employees in plaintiff's office in order to harass her, not because of their political affiliations. *See, Pembaur v. Cincinatti,* — U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ The first prong of the *Parratt* test requires a showing of a causal connection between defendant Mayor's acts under color of law and the alleged injuries. In the case before us, there is ample evidence on the record supporting such a showing. We, therefore, find, as a matter of law, that defendant's acts under color of law caused the injuries stated in the Findings of Fact.

The second prong of the 1983 analysis involves the determination whether the defendant Mayor's conduct deprived the plaintiff of her rights under the Constitution or laws of the United States. Plaintiff has alleged violation of her First Amendment rights to freedom of association.

As evidenced by the Findings of Fact, the plaintiff has established her prima facie case of political discrimination. The evidence reveals that defendant harassed and persecuted plaintiff because of her political affiliation up to the point where plaintiff advised the higher echelons of the NPP in Trujillo Alto that she no longer would be actively participating in local politics.

Secondly, defendant has presented no viable alternative reason for his conduct which would bring his actions under the analysis of *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). We, therefore, find that the sole basis for defendant's conduct was plaintiff's political association with the NPP.

Where, as here, political affiliation is the sole basis for the defendant's discriminatory conduct, we must scrutinize strictly whether there is any overriding government interest of vital importance to justify this conduct. *Elrod v. Burns*, 427 U.S. 347, 362, 368, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976). The ultimate inquiry here is whether party affiliation is an appropriate requirement for the effective performance of the public office involved. *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980). The answer here is no. The primary responsibility of the plaintiff prior to her harassment and eventual constructive dismissal concerned the keeping and maintenance of employees' personnel records; the preparation of the payrolls; the transmittal or processing of appointments; the preparation of the reports to be submitted to the Social Security Administration, the State Employees Retirement Fund and the medical plans; the personnel assistance records; and other records related to disciplinary actions against municipal employees. Thus, whatever policy making occurs in plaintiff's jobs must relate to the personnel needs of the Municipal Government and not to any partisan political interests.

The purpose behind defendant's conduct in this case was to harass plaintiff because of her political beliefs. Defendant used

every conceivable means to harass and persecute plaintiff. Such conduct hurts our democratic system of government. This practice exacts a ruthless toll on the individual employee's ability to act according to his beliefs and to associate with others of like political persuasion, thus, diminishing support for his political party. *Elrod v. Burns*, 427 U.S. at 355–56, 96 S.Ct. at 2681. Secondly, the free functioning of the electoral process suffers because competing political interests are not supported. *Id.*, at 356, 96 S.Ct. at 2681. We, therefore, find defendant Mayor liable to plaintiff.

### Damages

Under section 1983, a plaintiff who has proven actual damages is entitled to recover compensatory damages from defendants who deprived him or her of their constitutionally protected rights. *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Fernández v. Chardón*, 681 F.2d 42, 60 (1st Cir.1982). If proven, compensatory damages are available under section 1983 for emotional and mental distress as well. *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978).

In the case at bar, plaintiff has established serious damages inflicted by defendant Mayor Pedro Padilla. She suffered mental and emotional distress for being humiliated and intimidated and has suffered pain, frustration, anguish and embarassment during a period of time of approximately four years. Plaintiff's psychiatric condition was diagnosed by four different psychiatrists who had treated her. She is not able to work at present and her prognosis is uncertain. Plaintiff needs psychiatric and medical treatment for approximately two more years.

Therefore, defendant Padilla is liable for compensatory damages for the mental and emotional anguish and distress suffered by plaintiff on her work for approximately four years in the amount of $30,000.00. Defendant Padilla should also compensate plaintiff for the damages caused to plaintiff's personal or business reputation in the amount of $5,000.00.

Besides the previous intangible injuries suffered by plaintiff, several types of tangible losses should be awarded to her. From May 20, 1983, to January 19, 1984, and from March 8, 1984, to the present and due to defendant's conduct plaintiff's emotional sickness has not allowed her to work. During most of that time she has not received her monthly salary which actually was supposed to be $850.00 monthly. She was also forced to pay directly her medical plan. Therefore, plaintiff is entitled to receive from defendant Padilla the back pay or lost wages as well as other benefits she has not received. Accordingly, she is entitled to receive the lost wages she did not receive from May 20, 1983, to January 19, 1984, and from March 8, 1984, until March 29, 1987, the earliest date she could have retired. At that date she will be 58 years old and would have had ten years of service. *See*, 3 L.P.R.A. § 766. When applicable, the amount of lost wages she is entitled to receive must be decreased by the amount of her monthly pension of $350.00.

Plaintiff will need further psychiatric treatment for approximately two years on a weekly basis. Each visit costs $50.00. Therefore, she is entitled to receive approximately $5,200 for said treatment. Plaintiff will also need medications on a daily basis for approximately six months at a cost of $180.00.

Punitive damages are also available under section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Defendant meets this standard. He consciously harassed and threatened plaintiff because of her political affiliation. Therefore, plaintiff is entitled to receive $10,000.00.

Plaintiff, María T. Torres, is also entitled to recover from the defendant pre-

judgment interest, *Furtado v. Bishop*, 604 F.2d 80, 98 (1st Cir.1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); *Heritage Homes of Attleboro v. Seekonk Water Dist.*, 648 F.2d 761 (1st Cir.1981), as well as attorney's fees and costs. As for the attorney's fees, the plaintiff, as the prevailing party, is to submit a verified fee application within fifteen (15) days. *See, Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (1st Cir.1984); 42 U.S.C. § 1988.

In view of the aforementioned Findings of Facts and Conclusions of Law, judgment is hereby granted to plaintiff.

IT IS SO ORDERED.